No. 23-1909

In the
# United States Court of Appeals
### For the Fourth Circuit

**Jimmy Edwards; Robert Hunt; Dolores Hunt; Clifford McKellar, Jr.; Emma McKellar; West Lumberton Baptist Church; Currie Chain Saw, Inc.; C.J.M. Ventures, Inc.; William Locklear, d/b/a Strickland's Barbershop; TBL Environmental Laboratory, Inc.; Sammy's Auto Sales, Inc.; and Eric Chavis,**

Plaintiffs-Appellants,

*v.*

**CSX Transportation, Inc.,**

Defendant-Appellee.

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NORTH CAROLINA AT WILMINGTON

### BRIEF OF ALL APPELLANTS

Theodore J. Leopold
  (Fla. Bar No. 705608)
Diana L. Martin (Fla. Bar No. 624489)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408

Mark R. Sigmon (N.C. Bar No. 37762)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
900 West Morgan Street
Raleigh, NC 27603

William F. Cash III
  (Fla. Bar No. 68443)
**LEVIN, PAPANTONIO, RAFFERTY, PROCTOR, BUCHANAN, O'BRIEN, BARR, & MOUGEY, P.A.**
316 South Baylen Street, Suite 600
Pensacola, FL 32502


Counsel for Appellants

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1909          Caption: Edwards et al. v. CSX Transportation, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

All Appellants: JIMMY EDWARDS, ROBERT and DOLORES HUNT; CLIFFORD and EMMA MCKELLAR; WEST LUMBERTON BAPTIST CHURCH; CURRIE CHAIN SAW,

(name of party/amicus) INC.; C.J.M. VENTURES, INC.; WILLIAM LOCKLEAR; TBL ENVIRONMENTAL LABORATORY, INC.; SAMMY'S AUTO SALES, INC.; and ERIC CHAVIS.

who is _____appellants_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2. Does party/amicus have any parent corporations?  ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
   If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?      ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?     ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

NOTE: I certify that these answers are the same as to each one of the appellants.

Signature: /s/ William F. Cash III          Date: 1/12/2024

Counsel for: All appellants

# TABLE OF CONTENTS

TABLE OF AUTHORITIES                      iii

JURISDICTIONAL STATEMENT           1

STATEMENT OF ISSUES                 1

STATEMENT OF CASE                    2

SUMMARY OF ARGUMENT            13

ARGUMENT                         15

I.    Standard of review ........................................................... 15

II.   The district court erred in holding Plaintiffs' contract claim preempted under the Interstate Commerce Commission Termination Act, ICCTA. ........................... 15

     A.   The history of the Interstate Commerce Commission informs the meaning of the ICC Termination Act's preemption clause. ...................... 16

     B.   Implied ICCTA preemption turns on a fact-based analysis: does the regulation's "burden" on commerce outweigh its "local benefits"? .................. 19

     C.   The district court cited multiple invalid reasons to depart from this Circuit's settled ICCTA law. ........22

     D.   The district court contorted the factual record by ignoring Plaintiffs' substantial evidence and argument, and crediting all of CSX's thin evidence...24

         1.   The district court wholly ignored or minimized Plaintiffs' evidence............................25

         2.   The district court unquestioningly credited CSX's evidence even though Plaintiffs rebutted it. ......................................................... 31

III. The district court erred in holding that Plaintiffs could not be third-party beneficiaries of the Tri-Party Agreement. ..................................................... 33

    A.   The district court imposed an "active and direct dealings" requirement that is not part of North Carolina law. .............................................. 36

    B.   The district court, applying its erroneous test, faulted Plaintiffs for not meeting that test. .................. 38

IV. The district court erred in construing the Tri-Party Agreement to require performance by the City of Lumberton before it could be enforced. ............................ 43

CONCLUSION ................................................................. 48

REQUEST FOR ORAL ARGUMENT ................................ 48

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITS ..................................................... 50

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 15

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) .................................... 19

*Davis & Taft Architecture, P.A. v. DDR-Shadowline, LLC*,
268 N.C. App. 327 (2019) ............................................................................. 37

*Davis v. Woodlake Partners LLC*, 230 N.C. App. 88 (2013) .............................. 45, 46

*Edwards v. CSX Transp., Inc.*, 983 F.3d 112 (4th Cir. 2020) ............................. passim

*Ezell v. Kan. City S. Ry. Co.*, 866 F.3d 294 (5th Cir. 2017) ..................................... 17

*Fla. E. Coast Ry. Co. v. City of W. Palm Beach*,
266 F.3d 1324 (11th Cir. 2001) ............................................................... 18, 24

*Friberg v. Kan. City Southern Ry. Co.*, 267 F.3d 439 (5th Cir. 2001) ....................... 15

*Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638 (2d Cir. 2005) ..................... 18

*Handy Sanitary Dist. v. Badin Shores Resorts Owners Assoc., Inc.*,
225 N.C. App. 296 (2013) .............................................................................. 45

*Hospira Inc. v. Alphagary Corp.*, 194 N.C. App. 695 (2009) ............................. 36, 37

*In re Foreclosure of Goforth Properties, Inc.*, 334 N.C. 369 (1993) ........................... 45

*King County, Wash.*, 1 S.T.B. 731, 1996 WL 545598 (1996) .................................... 18

*N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238 (3d Cir. 2007) .............. 18

*Noonan v. Consol. Shoe Co., Inc.*, 84 F.4th 566 (4th Cir. 2023) .............................. 15

*Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150 (4th Cir. 2010) ............... 18, 20

*PCS Phosphate Co., Inc. v. Norfolk S. Corp.*, 559 F.3d 212 (4th Cir. 2009) ......... passim

*Prince George's Cty. v. Local Gov't Ins. Tr.*, 879 A.2d 81 (Md. 2005) ....................... 47

*Raritan River Steel Co. v. Cherry, Bekaert & Holland*,
329 N.C. 646 (1991) ...................................................................................... 34

*Sing Fuels Pte Ltd. v. M/V Lila Shanghai*, 39 F.4d 263 (4th Cir. 2022) ............. 15, 44

*Skidmore v. Norfolk S. Ry. Co.*, 1 F.4th 206 (4th Cir. 2021) .................................... 20

*Twp. of Woodbridge v. Consolidated Rail Corp.*,
2000 WL 1771044 (S.T.B. 2000) ................................................................... 21

*Varel v. Banc One Capital Partners, Inc.*, 55 F.3d 1016 (5th Cir. 1995) ..................... 47

*Wade v. Lutterloh*, 196 N.C. 116 (1928) ....................................................45

**Statutes**

24 Stat. 379 ............................................................................................16

28 U.S.C. § 1291 ......................................................................................1

28 U.S.C. § 1332 ......................................................................................1

49 U.S.C. § 10501(b) .........................................................................17, 19

Interstate Commerce Commission Termination Act, 109 Stat. 803 (1995) ............18

**Rules**

Fed. R. Civ. P. 23....................................................................................11

**Treatises**

Beau B. Bump, *Held Captive: How Increased Regulation Arrests Railroads' Ability to Serve the Nation*, 5 DePaul Bus. & Com. L.J. 731 (2007) ...................................17

Restatement (Second) of Contracts § 229 ............................................................47

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1332(a), the general diversity statute, and under Section 1332(d), the Class Action Fairness Act. Plaintiffs/Appellants are all North Carolina citizens, and the Defendant/Appellee, CSX Transportation, Inc., is a citizen of Virginia. The amount in controversy exceeds $75,000 as to each plaintiff and exceeds $5,000,000 as to the class.

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 because the district court entered a final judgment against the Plaintiffs on July 27, 2023. (JA4882–4883.) Notice of appeal was timely filed. (JA4884–4886.)

# STATEMENT OF ISSUES

1. Did the district court err by applying the wrong legal test, ignoring Plaintiffs' evidence of the local benefits from enforcing the Tri-Party Agreement, and crediting CSX's vague evidence in granting summary judgment on the question of federal preemption?

2. Did the district court err by ignoring Plaintiffs' evidence—including the testimony of the parties that formed the Tri-Party Agreement—in granting summary judgment on the issue of whether Plaintiffs were intended third-party beneficiaries of the Tri-Party Agreement?

3. Did the district court err in construing the Tri-Party Agreement to require performance by the City before it could be enforced?

## STATEMENT OF CASE

This action was previously heard by this Court after the district court dismissed it on motion to dismiss. (JA89–100.) In the prior appeal, this Court held that the district court misapplied North Carolina contract law by holding that Plaintiffs could, under no set of facts, be deemed third-party beneficiaries. *Edwards v. CSX Transp., Inc.*, 983 F.3d 112 (4th Cir. 2020). The Court also discussed the impact of ICCTA preemption on Plaintiffs' tort claims and, in two footnotes, discussed its relevance to Plaintiffs' contract claims.

Therefore, this action was reopened and the parties proceeded through fact and expert discovery. At the conclusion of discovery, CSX moved for summary judgment and the district court dismissed this action again. (JA162–165 (motion), JA4872–4881 (order granting motion).)

The district court got it wrong. Ignoring the law this Court handed down on third-party beneficiary status and on ICCTA preemption, the district court applied its own incorrect legal standards. Ignoring a substantial body of evidence that demonstrated a genuine dispute of fact, the district court credited only CSX's side of the facts. It granted summary judgment to CSX using on the wrong law and this subset of the factual record.

Plaintiffs ask this Court to reverse the Eastern District of North Carolina once again, correct the errors below, and remand this case for trial.

\*     \*     \*

As the Court already knows, this action was brought on behalf of a class of residents and businesses in a low-lying portion of Lumberton, North Carolina. These residents and businesses suffered two devastating floods—causing hundreds of millions of dollars in damage—because of one reason only: CSX knowingly and repeatedly broke its promise to permit the City to defend itself from floodwaters rolling across CSX's property.

Although there is a levee that would safeguard the city, it was built with an open gap where CSX's tracks come through. When the levee was built, CSX's predecessor contractually agreed that whenever necessary, whenever flood risk was imminent, the City of Lumberton could lay a temporary berm across the tracks and close that gap. CSX's predecessor, Lumberton, and the federal government—which paid for the levee—all knew that the levee would not function without the ability to close CSX's gap. The levee is worthless without CSX's cooperation. These facts aren't in dispute.

A summary of other essential facts follows:

CSX operates a line through Lumberton. The tracks run parallel to and lie south of the Lumber River, and they cross under Interstate 95 roughly perpendicularly. (JA3190 (overview showing river, tracks, and highway).) The Plaintiffs are eleven individuals or corporations and a church, all of whom live or

operate from properties in a zone of Lumberton that lies south and west of the CSX tracks.

In the 1960's, federal, state, and local government recognized that this part of Lumberton suffered from longtime flood problems. (JA903 (AECOM report discussing history).) The State of North Carolina created the Robeson County Drainage District No. 1, a public entity, and empowered it to work with the City to build a levee system that would protect the south and west sides of town from future high waters on the Lumber River. (JA910.) A levee was ultimately completed in 1977, between the CSX tracks and the river. (JA910.) This levee is significantly higher than the level of the railroad's trackbed. By design, the levee ties into the Interstate's overpass over the railroad. (JA910.) The mounded earth of the levee and Interstate are properly designed and hold back floodwaters as designed—but the system has one critical weakness, one its designers anticipated: the area Plaintiffs call "the CSX gap."

The CSX gap exists at the point where the railroad crosses under the Interstate. While the levee system and Interstate together are significantly higher than the level of the tracks, the tracks themselves pass through a gap in the combined earthen structures. No harm comes to the city in dry times, but in times of high water, the CSX gap must be blocked up, or the entire levee system is useless.

This was apparent to all at the time the levee was built—including CSX's predecessor, the Seaboard Coast Line Railroad Company, which agreed to pitch in and provide the solution. The federal agencies involved in planning the system in the 1960's agreed to fund the system, but only upon proof that the CSX gap could be blocked in time of need. (JA3191.)

Accordingly, in 1978, the City of Lumberton, the Drainage District, and CSX's predecessor entered into what all parties have called the "Tri-Party Agreement." (JA75–78.) As relevant here, the Tri-Party Agreement has two core functions:

- First, the agreement formally authorized the City and the Drainage District to build part of their levee system across railroad land. In this way, CSX's predecessor acknowledged that the system would contain a gap, and it acknowledged that the other parties and Lumberton's people were counting on it to perform when the day came.

- Second, the agreement allowed the City of Lumberton to temporarily block the CSX gap any time high waters were expected—breathing life into the otherwise entirely useless levee system. Specifically, in paragraph 8(a) of the Agreement, the City got "the right and privilege of closing [the levee] across said track and the roadbed thereof" when the City is "in eminent danger of flood" (sic) and when it gives "at least 12 hours notice prior to such closing." (JA77.)

The Tri-Party Agreement has never expired and CSX has never exercised its right to withdraw from it. Thus, it binds CSX today.

In 1979, a year after the Agreement was signed, the City enacted "Operational Procedures" spelling out how it would take action during a flood. (JA82–86.) That plan called for sandbagging of the tracks.

Over the years, CSX has intermittently honored and then disregarded the Agreement. CSX's roadmaster testified that CSX permitted sandbagging, specifically under the Agreement, during 2003, 2004, or 2005. (JA1802–1809 (overall), JA1808 ("there seemed to be an agreement").) In around 2006 to 2010, a different roadmaster refused a City request even though a storm was approaching the region. As will be discussed below, in 2017, a CSX roadmaster again refused to allow sandbagging and actually threatened the City with felony trespassing charges if it attempted to enforce the Agreement. In these years, Lumberton people were fortunate, and Lumberton did not flood.

However, Lumberton was not so fortunate in 2016 after Hurricane Matthew appeared off the North Carolina coast. It was clear that there would be a major rain event, and the City again sought permission from CSX to close its line. (JA883–886.) This time, CSX flatly refused. (JA887–888 ("he told me the answer was no").) The City stood by helpless as floodwaters rose in the river.

On October 10, 2016, millions of gallons of floodwater began coursing through the CSX gap. (JA3204.) These waters built and grew, flooding Plaintiffs' homes and businesses. There is an engineering report in the record, paid for by the State of

North Carolina, showing that the flooding displaced more than 1,500 people for months, damaged 2,367 structures, and caused $251,574,000 in damage. ( JA985.)

This was an entirely preventable catastrophe—and one that, through its contract with CSX, the City *had foreseen and attempted to prevent*. The weak link identified in the 1970's had finally broken.

After the flood, the State of North Carolina hired AECOM, an engineering consulting firm, to analyze the cause. AECOM's 2017 report, JA899–943, found that *the* "overriding factor that caused the majority of the devastation was the failure to have a proper closure" at the point of the CSX gap. ( JA920.) And AECOM found that if there was no future mitigation, "the first point of failure in the levee system protecting the project area" would be the same underpass. ( JA922.)

A hydrologic analysis showing how the swirling floodwaters moved through the CSX gap was printed in that report:



Figure 4-8: 2-Dimensional Hydraulic Model Representation of VFW Road and CSX Railroad Underpass during Hurricane Matthew

(JA996.) An aerial photo of streaking mud deposits at this same location is also in the record. (JA918.) It is beyond dispute that CSX's refusal to let the City close the gap is *the* cause of Plaintiffs' flood losses.

A second AECOM report, this one from 2018, JA949–1053, also found that the CSX gap was the cause of "drastic flooding in the interior of the levee." (JA964.) AECOM determined that a hypothetical floodgate in place during Hurricane Matthew would have prevented about $250,000,000 in direct or indirect damage in the Lumber Basin. (JA1000.) As the Court knows, the individually named Plaintiffs alone lost millions in property and suffered extreme hardship from lost business

income and displacement. The proposed class's damages were many multiples of that amount.

The flooding in 2016 was so severe that part of CSX's trackbed was washed away, too. (JA41 (photo of eroded tracks), JA2357–2358 (City engineer discussing CSX repair job), JA1724 (CSX employee discussing "washouts").) The CSX line was out of service for weeks. Ironically, had CSX permitted the City to block the gap, the portion of the line behind the levee would have been protected and undamaged along with Plaintiffs' homes.

After the 2016 Hurricane Matthew flooding, the City of Lumberton went on high alert over the CSX gap. When Hurricane Irma threatened to approach in 2017, the City again called the local roadmaster. In a voicemail, the roadmaster acknowledged that CSX had seen photos of the damage from Hurricane Matthew, but said, "running that by our Division Engineer, um, he said no." (JA2343–2344 (transcript of voicemail by court reporter).) CSX would not allow any sandbagging across its tracks, despite the Agreement. "[H]opefully that storm doesn't end up hurting us," its employee told the City. (JA2343.) Luckily, the 2017 storm took another path.

But in 2018, tragedy visited south and west Lumberton again. Once again, a hurricane approached North Carolina—this time, Hurricane Florence—threatening to bring devastating rains and high waters to the Lumber River. The

City asked CSX for permission to build a sandbag berm across the tracks, which CSX once again denied. (JA2369–2370.) This time, CSX threatened the City with felony trespassing, and told the City that "[y]ou could hurt yourself, hurt, you know, our trains." (JA2372–2373.) In fact, CSX's employee told the City, "you will be making a big mistake if you sandbag this opening." (JA775.)

The City begged the Governor's office for help. The Governor of North Carolina personally issued an emergency order demanding that CSX allow the temporary sandbagging. (JA894–898.) Even then, CSX officials demanded to see written proof of the order before they would allow access.

The City was finally able to build a semblance of a dam at the gap, but it was not strong enough to hold because CSX's footdragging cost the City precious time to get started. This berm failed, causing flooding similar to 2016's.

Plaintiffs' hydrology expert here established that there was sufficient time, materials, and manpower to build a temporary berm that would have protected the City—had CSX not stalled, wasting valuable construction time. (JA3229–3235.) The damage from CSX's obstruction was not just deplorable, it was egregiously predictable, given the memories of Hurricane Matthew's damage only two years earlier still fresh in everyone's minds.

Tragically, and pointlessly, many of the Plaintiffs actually suffered the same devastating losses a second time. For example, the Hunts had their house flooded

both in 2016 and 2018. (JA48–49.) Currie Chain Saw suffered flood losses in both years. (JA50.) And after the 2016 flood, Jimmy Edwards moved elsewhere in Lumberton, but in 2018 suffered flooding *there*. (JA48–50.) Undoubtedly, there were many other class members who also suffered repeat losses.

*     *     *

The Plaintiffs here are property owners and residents in a defined zone behind the Lumberton levee. Plaintiffs tendered a hydrology expert report in connection with their motion for class certification, filed the same day as the summary judgment motion, to define this zone. (JA3187–3277, JA3236 (pincite to zone map).)

After the Court's last ruling, this action proceeded on a single count: for breach of contract of the agreement between CSX, the City of Lumberton, and the Drainage District, whereby the Plaintiffs are intended third-party beneficiaries.

After discovery and expert disclosure, CSX moved for summary judgment, and Plaintiffs moved for certification of a class under Rule 23(b)(2), for injunctive relief, and under Rule 23(c)(4), seeking certification of a common-issues class so that each member could have liability established one time, leaving the issue of individual damages for later resolution. (JA691–728 (Pls.' class certification briefing).)

The district court granted summary judgment to CSX on each ground CSX sought. (JA4881.) The district court denied Plaintiffs' motion for class certification as moot. (JA4881.)

The district court's order on summary judgment is extremely thin: only six pages of the ten-page order provide any actual reasoning. (Compare with the 91 pages of briefing filed by the parties, not including the volumes of evidence.)

The district court ruled against Plaintiffs on three points:

- It ruled, as a matter of law, that Plaintiffs' contract claim is impliedly preempted under ICCTA. (JA4875–4878.) CSX's motion was founded on an assertion that enforcing the Tri-Party Agreement would unreasonably interfere with rail traffic, triggering federal preemption, and that Plaintiffs could demonstrate no genuine issue of fact to the contrary. The district court not only applied the wrong legal test, it wholly failed to even discuss much of the evidence Plaintiffs did submit. This was erroneous.

- It ruled that there is no genuine issue of material fact as to whether the Plaintiffs could be third-party beneficiaries under the Tri-Party Agreement. (JA4878–4880.) This decision was also premised on the wrong legal test, and the district court directly ignored the law this Court already established for the case. The district court also ignored substantial evidence from the City, the Drainage District, and CSX, which demonstrated that all parties had an intent to benefit the Plaintiffs. Granting summary judgment on the wrong law and none of the proffered facts was erroneous.

- And it ruled, in less than a full page of analysis, that the entire Tri-Party Agreement never even bound CSX because the City of Lumberton failed to perform a condition precedent that supposedly was implied in the

Agreement. (JA4880–4881.) That holding was incorrect as a matter of North Carolina contract law.

The district court's skimpy order does not offer this Court or the parties much in the way of thorough analysis. But the district court plainly erred by not following the course this Court charted out the first time around. This Court should reverse the district court and direct it to proceed further toward trial.

## SUMMARY OF ARGUMENT

As to the preemption question, the district court ignored this Court's prior holding *in this case*, as well as Fourth Circuit precedent and relevant holdings from other federal courts and the Surface Transportation Board. Those authorities all counsel that the test for whether a regulation—here, contract law—is preempted under ICCTA is whether the regulation unreasonably burdens interstate commerce via rail. And that question turns on whether the local benefits of enforcing the regulation outweigh the burdens on rail transportation. The same Fourth Circuit precedents also counsel that, where there is a voluntary agreement (which the Tri-Party Agreement is), the balance almost always comes out *against* preemption. That is because a voluntary agreement reflects a rail carrier's own assessment that the agreement will not unreasonably burden it—or the carrier would not have signed it.

The district court did not follow this law, because it completely ignored *all* of Plaintiffs' evidence about the local benefits the Tri-Party Agreement provides.

Instead, it focused its analysis *solely* on CSX's supposed burdens. Even there, it credited only CSX's evidence—mostly, one person's self-serving declaration—but ignored Plaintiffs' rebuttal evidence and argument as to the true burden of the Agreement. This violated the summary judgment rule, and it was error.

As to the standing question—whether Plaintiffs produced sufficient evidence to defeat summary judgment on the question of standing as third-party beneficiaries—the district court's analysis was similarly wrong and blinkered. The district court's chief legal error was in adding a fourth prong—a phantom requirement that there must be "active and direct dealings" between the Plaintiffs and the contracting parties—to the three-prong test this Court gave as the law of the case. Then, the district court analyzed only a tiny fraction of the evidence Plaintiffs came forward with and found that evidence lacking in light of the erroneous standard. That was error.

Finally, as to the question of whether the Tri-Party Agreement contained a condition precedent requiring the City of Lumberton to build an earthen dike before CSX was required to do anything at all, the district court simply turned a permissive license into a mandatory condition precedent. No such condition is in the Agreement.

All of these errors of law are reviewed *de novo*. So is the district court's misapplication of the summary judgment standard. This Court should reverse the decision below and send this action back to the district court again for trial.

## ARGUMENT

### I.   Standard of review

The district court granted CSX's motion for summary judgment under Rule 56. Accordingly, the standard of review is *de novo. Noonan v. Consol. Shoe Co., Inc.*, 84 F.4th 566 (4th Cir. 2023). To survive summary judgment, a plaintiff must point to "evidence on which the jury could reasonably find for" her. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

The preemptive effect of a federal statute is reviewed *de novo. Friberg v. Kan. City S. Ry. Co.*, 267 F.3d 439, 442 (5th Cir. 2001).

The construction of a contract is also reviewed *de novo. Sing Fuels Pte Ltd. v. M/V Lila Shanghai*, 39 F.4d 263, 269–70 (4th Cir. 2022).

### II.   The district court erred in holding Plaintiffs' contract claim preempted under the Interstate Commerce Commission Termination Act, ICCTA.

Five years ago on motion to dismiss, the district court actually decided this issue for Plaintiffs: "Plaintiffs' breach-of-contract claim . . . would not be preempted by the ICCTA. When a railroad enters into a voluntary agreement, and then breaches that agreement, the counterparty can sue to enforce the agreement without being categorically barred" by ICCTA preemption. ( JA97, n.1.)

The district court got it right the first time. After the case came back from this Court in 2020, the district court reversed course. The district court's analysis on motion for summary judgment deviates from the course this Court laid out. Its decision should be reversed.

### A. The history of the Interstate Commerce Commission informs the meaning of the ICC Termination Act's preemption clause.

It is important to put the ICCTA statute in its historic context, because that context informs the limited scope of ICCTA's preemption clause. Plaintiffs anticipate that CSX will attempt to shear that context away, as it did in the court below.

The Interstate Commerce Commission was the first federal regulatory agency and was created in 1887. 24 Stat. 379. Initially, the purpose of the ICC was to provide uniform oversight of a railroad market that was subject to innumerable and sometimes conflicting State and local rules. The ICC's initial purpose was to knit the Nation together by providing for a uniform federal approach. However, its jurisdiction was not exclusive; there was still a zone of control for States, and there were areas subject to concurrent regulation by *both* the federal agency and States. This structure multiplied confusion.

Over the decades, the ICC grew infamous for its ham-handed, inflexible approach to rail transportation. The ICC's statutory charge was to oversee freight rates and make them "reasonable and just," 24 Stat. 379. Its bureaucratic apparatus

functioned by (sluggishly) hearing rate cases and issuing orders. This was *economic* regulation, regulation of charges and tariffs, not regulation of *all* aspects of the rail industry. But the ICC was famously sclerotic, and as one commentator has written, "the ICC's regulation of the railroad industry stifled competition not only in the railroad industry itself, but also impaired the railroad industry's ability to compete with other transportation industries." Beau B. Bump, *Held Captive: How Increased Regulation Arrests Railroads' Ability to Serve the Nation*, 5 DePaul Bus. & Com. L.J. 731, 738–39 (2007). Shippers and railroads alike complained to Congress for decades that the ICC's economic regulation was doing more harm than good; railroads blamed the ICC's bureaucracy for contributing to a wave of bankruptcies and disinvestment.

With that history in mind, the straitjacketed rail industry finally convinced Congress to pass the ICC Termination Act in 1995. 109 Stat. 803, *codified at* 49 U.S.C. §§ 10101, *et seq.* The ICCTA was intended to bring about "deregulatory policies that have promoted growth and stability in the surface transportation sector." *Ezell v. Kan. City S. Ry. Co.*, 866 F.3d 294, 298 (5th Cir. 2017). And the ICCTA transferred some of the old ICC's regulatory powers to the new Surface Transportation Board. The Act transferred some of the States' former *economic* regulatory powers to the STB, and it did so via its preemption provision, codified at 49 U.S.C. § 10501(b).

The scope of the Termination Act's preemption clause was determined in an early STB case. *King County, Wash.*, 1 S.T.B. 731, 1996 WL 545598 (1996). In *King County*, the Board determined that federal preemption of State regulations is not absolute. *Id.* at *3–4. It held that "the ICCTA does not usurp the right of state and local entities to impose appropriate public health and safety regulation on interstate railroads." *Id.* at *3. "Not all state and local regulations that affect interstate commerce fail." *Id.* at *4. This Circuit has held that ICCTA's preemption clause is "narrowly tailored," and "displace[s] only 'regulation,' i.e., those state laws that may reasonably be said to have the effect of 'managing' or 'governing' rail transportation." *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 157–58 (4th Cir. 2010). This Circuit is in good company. *Accord N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 252 (3d Cir. 2007); *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 643 (2d Cir. 2005); *Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324, 1331 (11th Cir. 2001) (preemption is "narrowly tailored" to displace only laws that have the effect of managing or governing "rail transportation").

Accordingly, ICCTA did *not* bar every single State or local law that might touch a railroad's operations. The ICCTA "reflect[s] the focus of legislative attention on removing *direct* economic regulation by the *States*, as opposed to the incidental

effects that inhere in the exercise of traditionally local police powers such as zoning." *Id*. at 1337 (11th Cir. 2001) (emphasis in original).

In conclusion, although Congress did enact the ICCTA to partially deregulate the rail sector, "the regulation sought to be 'minimize[d]' [wa]s at the federal (not local) level." *Id*. at 1338. The ICCTA's drafters were concerned with the "direct and complete pre-emption of State *economic* regulation of railroads," meaning regulations over rates, tariffs, freight classifications, and other economic matters. *PCS Phosphate Co., Inc. v. Norfolk S. Corp.*, 559 F.3d 212, 218–220 (4th Cir. 2009) (emphasis added). Regulations with only an incidental effect on railroading are not preempted, nor are regulations that do not unduly burden railroading.

**B. Implied ICCTA preemption turns on a fact-based analysis: does the regulation's "burden" on commerce outweigh its "local benefits"?**

As an opening matter, there is a presumption against federal preemption where "the historic primacy of state regulation of matters of health and safety" is concerned, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 384 (2001), and this case—involving flood control to protect life and safety—ought to be considered such a case. The ICCTA's express preemption clause, Section 10501(b), does not apply to contract claims, and this Court has already held that Plaintiffs' contract claim was not expressly preempted. *Edwards*, 983 F.3d 112 at 121, n.11. However, this Court left open the question of whether the contract claim could be *impliedly* preempted. *Id*.

This Court has addressed implied ICCTA preemption several times. The most in-depth discussions are found in *PCS Phosphate* (2009); *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150 (4th Cir. 2010); the first appeal of this case, *Edwards v. CSX Transp., Inc.*, 983 F.3d 112 (4th Cir. 2020); and *Skidmore v. Norfolk S. Ry. Co.*, 1 F.4th 206 (4th Cir. 2021). All of these cases have adopted the national majority view that "Congress narrowly tailored the ICCTA preemption provision to displace only 'regulation,'" meaning state laws that "have the effect of 'managing' or 'governing' rail transportation." *E.g.*, *PCS Phosphate*, 559 F.3d at 218.

This Court analyzes a challenged regulation by applying "the generally accepted test for ICCTA implied or conflict preemption: does the enforcement action 'unreasonably interfer[e]' with rail transportation?" *Id.* at 220–21. Further, this Court has held that determining whether a regulation "imposes an 'unreasonable burden' on interstate commerce depends on whether the burden . . . imposed by the regulation outweighs the local benefits it provides." *Id.* at 221.

*That is the baseline test for implied preemption:* does the burden imposed by the challenged regulation outweigh the local benefits it provides?

In the case of contracts—"voluntary agreements"—however, this Court defers greatly to the parties' own assessment of whether the burden outweighs the benefit. "In the context of voluntary agreements, we let the market do much of the work of the benefit-burden calculation." *Id.* This Court has endorsed the Surface

Transportation Board's holding that "voluntary agreements must be seen as reflecting the carrier's own determination and admission that the agreements would not unreasonably interfere with interstate commerce." *Id.* (citing *Twp. of Woodbridge v. Consolidated Rail Corp.*, 2000 WL 1771044, at *3 (S.T.B. 2000) and collecting cases). Thus, the window of circumstances under which a voluntary agreement with a railroad might nevertheless be preempted is narrow.

The Court's precedent on preemption of contract claims is in line with the ICCTA's history and deregulatory spirit. The ICCTA intended to displace unreasonably burdensome State *economic* regulation: rates, tariffs, and the like. But a rail carrier that has willingly entered into a contract which binds it, *ab initio* has made the assessment that the contract is not an "unreasonable burden" on that carrier's operations.

The district court's exceedingly thin preemption analysis was erroneous in two self-reinforcing ways. First, the district court got this law wrong; it improperly injected irrelevant legal considerations into the analysis, and it totally failed to mention or apply *PCS Phosphate*'s inquiry into whether the regulations "local benefits" outweigh its burden. Second, in the less than two pages that actually constituted the application of law to fact, the district court failed to discuss or acknowledge the significant body of evidence Plaintiffs brought forth, while unquestioningly crediting CSX's scant evidence.

## C. The district court cited multiple invalid reasons to depart from this Circuit's settled ICCTA law.

Plaintiffs turn first to the district court's legal errors. Nowhere in the short order under review does the district court engage with this Circuit's binding test for whether a regulation "imposes an 'unreasonable burden' on interstate commerce," which calls for determining "whether the burden . . . imposed by the regulation outweighs the local benefits it provides." *PCS Phosphate*, 559 F.3d at 221. Perhaps this failure explains the district court's failure to discuss even *one* fact proffered by Plaintiffs about the local benefits the Tri-Party Agreement provides. (These facts are discussed in the next section.)

Whatever the case, the district court's failure to engage with the right legal test infects its entire analysis. The district court flat-out used the wrong standard, and all of its analysis after that point was similarly wrong. For this reason alone, the district court should be reversed.

But the district court's preemption conclusion also rests on three other legal errors or non sequiturs, which it said distinguished its special legal standard from the actual binding law of this Circuit. ( JA4877–4878.) None of these support it.

*First*, the district court cited the age of the Tri-Party Agreement as a reason to discount Circuit precedent that voluntary agreements are not ordinarily preempted, implying that the ICCTA somehow upended it. ( JA4877.) The district court did so in a single sentence, with no analysis for this Court to review. That just has no

precedent in this Circuit, and nowhere in the legislative history or text of the ICCTA did Congress say that the statute was intended to wipe away active contracts as of the date of enactment. Indeed, that would be a nonsensical result that would have upended every deal the industry had made for over a century.

The district court's rule also collides with (or ignores) the fact that this Court has upheld other "old" contracts as not preempted. For example, in *PCS Phosphate*, this Court declined to preempt contracts that were signed in 1965, thirty years before the ICCTA, noting that "the parties contemplated delayed enforcement of the agreements" and that the railroad had "received the benefit of the agreements for over 40 years." *PCS Phosphate*, 559 F.3d at 215, 221–22. Those contracts were older than the 1978 Tri-Party Agreement.

Plaintiffs' reliance interest is especially crucial to vindicate here. The City of Lumberton, the Drainage District, and the people who have made their homes and their livelihoods behind the safety of the Lumberton levee are entitled to rely on the protection extended by CSX's predecessor and CSX. The Tri-Party Agreement will be needed as long as the levee is needed. The district court's drive-by analysis here undercuts that analysis.

*Second*, the district court held that "this is not a contract between private actors," but rather between now-CSX and the City and the Drainage District. (JA4877–4878.) Again, there's no analysis or explanation here why that matters,

and it in fact runs contrary to common sense. The fact that the City and Drainage District entered into the Tri-Party Agreement ("for the benefit of their citizens and residents," by the way, JA4878) should be all the *more* reason not to preempt the Agreement under ICCTA. The Tri-Party Agreement vindicates North Carolina's "exercise of traditionally local police powers," which the ICCTA was in no way designed to displace. *Fla. E. Coast Ry. Co.*, 266 F.3d at 1337.

*Third*, the district court cited this Court's first opinion and said that "it is the law of this case is that 'closing an otherwise open rail line' is something 'only a railroad can do' and is 'conduct . . . clearly encompassed by the plain language of [ICCTA].'" (JA4878.) This passage comes from the Court's analysis on the preempted tort claims, not the contract claim at issue here. And the district court's rationale fails to embrace the obvious: CSX did have the power to close its rail line, but handed it off to the City of Lumberton when it signed the Tri-Party Agreement. Finally, the district court went on to concede that this Court could have preempted the entire action but declined to do so. So the relevance of this citation is a mystery.

## D. The district court contorted the factual record by ignoring Plaintiffs' substantial evidence and argument, and crediting all of CSX's thin evidence.

In hearing Plaintiffs' first appeal, this Court held that implied preemption was a "fact-specific issue" that could not be decided at the motion to dismiss stage. *Edwards*, 983 F.3d 112 at 121, n.11 (*see also id.*, n.12 ("fact-intensive inquiry")). On

remand, it was Plaintiffs' obligation to discover those facts and it was the district court's charge to fairly consider the factual evidence submitted.

At the close of discovery, CSX sought summary judgment. In opposing CSX's motion, Plaintiffs put several facts into the record to rebut CSX's arguments. (JA1587–91 (Pls.' opposition briefing).) The district court also had Plaintiffs' contemporaneously-filed class certification briefing and the exhibits attached there. (JA691–728.)

Under the proper legal test, the district court should have made a straightforward summary judgment decision about the evidence that would fall into either pan of a two-armed balancing scale. The question to ask was: (1) did Plaintiffs tender any evidence of "local benefits" in favor of enforcing the Agreement, *or* (2) did Plaintiffs respond with any evidence to rebut CSX's assertion that there was an "unreasonable burden" on railroading?

But the district court disregarded the summary judgment standard by wholly failing to discuss Plaintiffs' evidence. In fact, the district court affirmatively *disclaimed* it by holding that "Plaintiffs have not proffered evidence which would create a genuine issue of material fact . . . ." (JA4877.) This is just not so.

### 1. The district court wholly ignored or minimized Plaintiffs' evidence.

Plaintiffs put several categories of evidence and argument into the record. They follow, organized by theme.

*Limited time period the Agreement would have been in effect.* Perhaps the most compelling piece of evidence Plaintiffs proffered was the extremely limited nature of the impact closing CSX's line under the Tri-Party Agreement would have on CSX. (JA1588–1589.) The district court completely ignored this evidence. Plaintiffs pointed out that out of the over-16,000 days it has been in effect, the Agreement would have closed the line just 27 days, or "less than 0.2% of the time." (JA1588–1589.) As will be shown in photos below, CSX's rail line was completely underwater during and after both floods. This was evidence that rebutted CSX's claim that the Agreement "unreasonably interfered" with rail transportation. The amount of any interference was *de minimus*.

*Limited purpose and conditions for which the Agreement could be activated.* The Tri-Party Agreement contains important limitations on its use. The Agreement can only be invoked in "[im]minent danger of flood." (JA77 ¶ 8(a).) It can only be invoked after 12 hours' notice. (JA77 ¶ 8(a).) Any barrier built must be removed when the danger of flood has passed. (JA77 ¶ 8(b).) And the costs of building the barrier fall solely on the City. (JA77 ¶ 8(b).) All of these facts go to the core question of whether the "local benefits" of the Agreement outweigh the burden imposed by the Agreement. These facts show that the burden is slight and appropriately tailored to the needed remedy: the protection of the town from devastating floods.

By *definition*, the Tri-Party Agreement remains dormant in normal times and swings into action *only* during a flooding emergency. The kind of flooding contemplated in the Agreement would be so severe as to disable the CSX line. In that kind of flood, the land would be underwater, and the tracks would not be usable.

*The line was closed anyway—by flooding and storm damage.* The district court also ignored the critical evidence that CSX's line would have been unusable during periods when the Agreement was activated anyway—because the line was completely underwater. (JA1589–91 (Pls'. briefing).) Plaintiffs pointed out that "the floods and scouring of the line during Hurricane Matthew were so severe that the tracks had to be repaired; the crossties were literally hanging from the tracks into a gap created by the scouring." (JA1589 (briefing), JA2357–2358.) Plaintiffs cited to the photos, testimony, and expert reports showing just how that storm destroyed the line. Plaintiffs also pointed out that CSX had to "clos[e] the tracks anyway after they were underwater and literally being washed away." (JA1590.)

Here is how the CSX tracks looked after the 2016 hurricane:



Figure 7: Water flows south from VFW Road Underpass Washing Out Railroad and Overtopping VFW Road

( JA917.) Another photo also shows the line completely submerged:



Figure 8: I-95 Abutments Eroded on SW Side of Underpass. Railroad not Apparent

( JA918.) That kind of flooding destroyed signals, electrical installations, and ruined the trackbed. Plainly, if *anything* burdened interstate commerce, it was the flood.

Finally, one other valuable piece of evidence was in the record, the engineering report showing that Hurricane Matthew *alone* displaced 1,500 people, damaged 2,367 structures, and caused damage valued at $251,574,000. *Edwards*, 983 F.3d at 117, n.5; JA985. There was neutral engineering opinion in the record that closure of the gap would have prevented the flood and all of this damage. ( JA1000.) To put it mildly, that's evidence of a "local benefit." *PCS Phosphate*, 559 F.3d at 221.

Plaintiffs' burden here at summary judgment—to come forward with *some* evidence to rebut the defendant's—was minimal, and more than met. Plaintiffs put copious evidence of "local benefit" before the district court, but that court completely failed to acknowledge or engage with it. For that reason alone, the district court's grant of summary judgment was erroneous.

*   *   *

On the other side of the scale, Plaintiffs adduced other evidence that the Tri-Party Agreement did not really pose an "unreasonable burden" on CSX:

*Past performance by CSX.* For example, Plaintiffs noted that CSX did permit closure of the gap during a storm in 2003, 2004, or 2005. ( JA1587.) Plaintiffs cited to the deposition of Robert Grooms, CSX's roadmaster at the time, who testified that CSX permitted a closure of the gap specifically under the Agreement.

(JA1802–1809 (overall), JA1808 ("there seemed to be an agreement and that whatever happened we had to have at least a 12-hour notice").) Grooms admitted that, at the time, CSX raised no objection that the Agreement unreasonably burdened its operations. *See also* JA1707–1708 (Grooms's boss testifying "we allowed them to sandbag").

CSX's actual behavior and response in the past is highly relevant to its litigation-driven arguments today that there would be an unreasonable burden connected with its compliance. The district court acknowledged Plaintiffs' argument here, but rejected it in a single sentence without any analysis. (JA4877 ("none of those arguments create a material issue").)

*CSX remains in the Agreement today.* Plaintiffs also pointed to evidence that CSX is still party to the Tri-Party Agreement today, despite the clause permitting CSX to withdraw. (JA1588 (argument), JA77 ¶ 10 (clause).) Plaintiffs argued to the district court that this is strong evidence the Tri-Party Agreement is not unreasonably burdensome to CSX.

The district court dismissed this argument in one sentence, JA4877, but it holds real force. Consider that CSX had the ability to unilaterally terminate the Tri-Party Agreement: in 1978 after signing . . . when it was agreeably invoked in 2003–05 . . . before Hurricane Matthew in 2016 . . . when CSX refused to honor it in 2017 during Hurricane Irma . . . and *before* Hurricane Florence in 2018. Each of these

events put the spotlight on the Agreement—sometimes highly publicly—and offered CSX a decision point: stay or go. A reasonable factfinder can draw a straightforward inference that CSX was not unreasonably burdened by its participation in the Agreement, or it would have withdrawn. After all, it's not like CSX simply forgot that it had agreed to be bound. The district court barely mentioned this evidence.

*CSX's predecessor drafted the Agreement.* Evidence in the record was uncontroverted that the Seaboard Coast Line drafted the Agreement, not the City. Plaintiffs argued that this was further evidence the Agreement does not unreasonably burden railroading. (JA1588 (argument), JA2065 ("we would thank you for preparing the license agreement").) The district court summarily rejected this evidence also. (JA4877.)

\*   \*   \*

The district court therefore either wholly ignored, or dismissed as trivial, all of the evidence above—some of which went toward the "local benefits" of the Agreement, and some of which went toward the "unreasonable burden" CSX urged on the court.

### 2. The district court unquestioningly credited CSX's evidence even though Plaintiffs rebutted it.

The district court spilled comparably much greater ink, JA4875, JA4877, discussing and crediting *CSX's* evidence of a burden, however, which consisted

chiefly of a self-serving affidavit by Michael Dilday, a CSX employee. (JA365–368.)
Dilday's declaration asserted that there were "twelve to thirteen trains . . . across
the Wilmington Subdivision per day," that CSX "typically" operates trains "during
the time leading up to and following adverse weather events, that the military "has
influence" over closure decisions by CSX, and that the Lumberton line is
sometimes used to haul hazardous materials. (JA4877 (district court), JA367
(Dilday declaration).)

Plaintiffs pointed to the conclusory, open-ended nature of the declaration.
(JA1590–1591.) Indeed, Dilday does not say that the military *did* seek to keep the
line open; Dilday does not say that CSX *did* continue to operate during and
immediately after the hurricanes; and Dilday did not say that any hazardous
material actually *was* scheduled for transport at any time. A reasonable inference is
that if these statements were true, Dilday would have gone further and said them.

Despite the holes in the quality of the evidence, the district court wholly
credited it, rejected Plaintiffs' criticisms of CSX's evidence, and in fact did not
even mention them. This one-sided analysis is inconsistent with the summary
judgment standard.

\*    \*    \*

Enforcing the Tri-Party Agreement is not *verboten* by the ICCTA. The ICCTA
did away with State-law *economic* regulation, but that's not what the Agreement is.

The Agreement is a public safety, police-powers regulation if anything—one which CSX's predecessor willingly accepted and one which CSX has never actually repudiated. ICCTA is not the silver sword that CSX wishes it were.

CSX was plainly not entitled to summary judgment in the face of multiple lines of admissible evidence that Plaintiffs proffered of concrete "local benefits" and minimal, actual "burden" on CSX's railroading operations during these catastrophic floods. The district court's flawed law and blindness to the facts led it to the improper conclusion that Plaintiffs' contract claim was preempted. That decision must be reversed.

## III. The district court erred in holding that Plaintiffs could not be third-party beneficiaries of the Tri-Party Agreement.

The district court also erred in rejecting Plaintiffs' claim to be third-party beneficiaries of the Agreement. (In a different part of its opinion, the district court offhandedly noted that "the City of Lumberton and the Drainage District entered into the TPA for the benefit of their citizens and residents." (JA4877–4878.) The district court is right: Plaintiffs *were* the intended beneficiaries of the Agreement.)

But the district court actually analyzed the issue of Plaintiffs' status in just five paragraphs. (JA4878–4880.) Its analysis was flawed because the district court imposed a legal requirement that is not present in the law, contra the law already given by this Court in the first appeal. It also, again, failed to take account or even

mention the evidence Plaintiffs submitted in rebuttal to CSX's motion. Its grant of summary judgment to CSX on this point should be reversed, too.

This Court already established the law of the case on the first appeal. *Edwards*, 983 F.3d at 117–20. The Plaintiffs have standing to enforce the Tri-Party Agreement as third-party beneficiaries if (1) they show the contract exists, (2) it is valid and enforceable, and (3) "the contracting parties 'intended primarily and directly to benefit [them] or the class of persons to which [they] belong[]." *Id.* at 117. The Court held that "the third element—intent to benefit—is key here." *Id.* "Citizens cannot ordinarily sue for breach of a city contract; but if it's clear that the parties intended to benefit them specifically and directly, they can." *Id.* at 119.

The Court also held that to find that intent, the focus is on the written agreement itself as well as the "circumstances surrounding the transaction." *Id.* at 118 (quoting *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 329 N.C. 646 (1991)). "That means looking outside the 'four corners' of the contract when necessary . . . ." *Id.*

On motion to dismiss, the district court held that Plaintiffs did not plausibly allege any way that they could be intended beneficiaries of the Tri-Party Agreement. This Court reversed, because the complaint contained allegations "which, fairly viewed, indicated that the contracting parties intended to benefit a defined group of Lumbertonians—those living and working in the south and west

sides of the city." *Id.* Specifically, this Court credited Plaintiffs' allegations that the levee system was designed in the 1960s to protect the south and west sides of Lumberton; that the Tri-Party Agreement was designed to "deal with the inevitability of flooding at the gap"; and that the City's Operational Procedures ultimately noted that the Agreement's "specific aim" was to "provide flood protection to South and West Lumberton." *Id.* "Taken together," this Court held, these allegations plausibly supported Plaintiffs, and reversed the district court.

At summary judgment, Plaintiffs supplied the district court with hard evidence to prove each one of these allegations—plus more, because Plaintiffs also came forward with more documentary and testimonial evidence from the City, the Drainage District, and CSX's predecessor as to their intent in negotiating the Tri-Party Agreement.[1] That evidence ought to have been sufficient to carry Plaintiffs' summary judgment burden.

But the district court's analysis was infected with two errors. One was legal: the district court did not apply the law this Court handed down. The other was factual: the district court, again, simply ignored the evidence Plaintiffs submitted on their summary judgment burden.

---

[1] Plaintiffs did not make specific argument in the summary judgment briefing about the City's Operational Procedures; they were, however, attached to the complaint, JA82–86, which is how this Court was able to discuss them. Obviously, the district court, which read the complaint and this Court's opinion, was aware of them too.

### A. The district court imposed an "active and direct dealings" requirement that is not part of North Carolina law.

Paragraphs 1 and 2 of the district court's discussion of standing recited much of the law this Court established in the first appeal. *Compare* JA4878–4879 *with Edwards*, 983 F.3d at 117–20. However, the district court went on to add a further legal requirement that is not consistent with this Court's opinion or North Carolina law.

As written by the district court, that rule is: "Courts require evidence of 'active and direct dealings' between the plaintiff and the parties to the contract before conferring third-party beneficiary status. *Hospira Inc. v. Alphagary Corp.*, 194 N.C. App. 695, 703 (2009)." (JA4879.) The district relied solely on *Hospira*—and no other case—as the source of this purported rule.

This was error. North Carolina law contains no "active and direct dealings" requirement for a plaintiff to proceed as a third-party beneficiary. It is simply the district court's recycled error of law—one this Court has already corrected once. *Edwards*, 983 F.3d at 119 ("the district court relied on two North Carolina cases that warrant discussion here").

Hospira was a medical device manufacturer involved in a dispute with two subcontractors over shoddy quality control. *Id.* at 697–98. Hospira sued one of them, claiming to be a third-party beneficiary of a contract between the subcontractors. *Id.*

The *Hospira* court recited three elements of a North Carolina third-party beneficiary claim: (1) existence of a contract; (2) contract is valid and enforceable; and (3) contract was entered into for the plaintiff's direct, not incidental, benefit. *Id.* at 702–03. Like this Court, *Hospira* held that "we must consider the surrounding circumstances as well as the language of the contract." *Id.* at 703.

On prong (3), *Hospira* held that a person is a "direct beneficiary . . . if the contracting parties intended to confer a legally enforceable benefit on that person." *Id.* at 703. It then went on to analyze the evidence produced on that point, and found that Hospira had "provide[d] no evidence to suggest that it was an intended beneficiary of the contract." *Id.* at 703. The *Hospira* court did hold that evidence of "active and direct dealings" with the subcontractors *could have* supported Hospira's position in a case like that one, where the intent to benefit the plaintiff was "not contemplated by the contract itself." *Id.* at 703.

But by no means does *Hospira* impose an "active and direct dealings" requirement across the board in all cases. Nor has the North Carolina Supreme Court ever mentioned or adopted such a requirement. In fact, few available decisions, other than those authored by the district judge below, have ever *mentioned* that passage from *Hospira*.

One which did was *Davis & Taft Architecture, P.A. v. DDR-Shadowline, LLC*, 268 N.C. App. 327, 333, (2019), in which the court held that "'[a]ctive and direct

dealings' . . . *may* confer third-party beneficiary status upon a plaintiff." *Id*. (emphasis added).

That is the proper reading of *Hospira*: that dealings *may* contribute to a finding of intent to benefit the third party. As this Court has already held once, "*Hospira* [] boil[s] down to intent." *Edwards*, 983 F.3d at 119.

To reiterate, this Court handed down a three-element test: "(1) the contract exists; (2) the contract is valid and enforceable; and (3) the contracted parties 'intended primarily and directly to benefit him or the class of persons to which he belongs.'" *Edwards*, 983 F.3d at 117. There is no fourth element, "(4) and there must also be some active and direct dealings between the plaintiff and the parties." The district court simply erred on the law.

## B. The district court, applying its erroneous test, faulted Plaintiffs for not meeting that test.

Having gotten the law wrong again, the district court went on to criticize Plaintiffs for not meeting that legal test. Paragraph 3 of this section of the order below flatly says: "Plaintiffs have further failed to create a genuine issue of material fact as to whether there were active and direct dealings between the proposed third-party beneficiaries and the parties to the TPA." (JA4879.) Paragraph 4 similarly went on to state that "[t]he circumstances surrounding the TPA also do not reveal any active and direct dealings between plaintiffs or any community members and the parties to the TPA." (JA4879.)

Again, that is simply a misreading of what this Court meant by "consider[ing] [the] circumstances surrounding the transaction." *Edwards*, 983 F.3d at 118. What this Court meant was that the district court should do more than just read the express language of the contract.

Plaintiffs came forward with significant evidence of the circumstances surrounding the formation of the Tri-Party Agreement which do support an intent by all parties to benefit Plaintiffs. ( JA1593–1599 (Pls.' briefing).) But because of its incorrect legal test, the district court did not even discuss much of that evidence.

Plaintiffs put forward several documents, among:

- *Communications from the Drainage District regarding the need for the Lumberton levee.* Plaintiffs put forward a February 26, 1975, letter from the Drainage District to the North Carolina Department of Natural and Economic Resources, in which the District stated that the "overall purpose of the project is" to "prevent flooding of urban and residential areas and to protect residents of the City of Lumberton" against floods. ( JA2056.) The letter goes on to state that "[t]he area to be protected . . . is on the south side of the Lumber River." ( JA2058.) It also states that: "Evacuations are common with many families being out of their homes for a week or more at a time. The resultant property damage cannot be minimized. . . . For the residents and property owners living in the unprotected area, the construction of the dike will be the most meaningful program ever instituted by their municipality." ( JA2058.)

- *Communications from the City of Lumberton regarding the Lumberton levee.* Plaintiffs also tendered a February 26, 1975, letter from the City of Lumberton to the Drainage District. It reads: "the City of Lumberton is vitally interested in the construction of the dike along the south side of

Lumber River which would afford flood protection for the residents of the area to be protected. . . . We also are vitally concerned with the human needs of the people living in the unprotected area, . . . ." (JA2061.)

- *Communications surrounding the Tri-Party Agreement's formation.* Plaintiffs put forward a March 15, 1978, letter from the Drainage District to CSX's predecessor, in which the Drainage District states that the purpose of the levee is to prevent "the Lumber River from flowing into the southern part of the city during high water stages." (JA2053.) Plaintiffs also filed an April 18, 1978, letter from the Drainage District to the Seaboard Coast Line, in which the Drainage District stated: "In order to protect the city, in times of flood stage, from having the water enter . . . down the railroad road bed, emergency protection measures would need to be provided to protect the railroad road bed." (JA2063–2065.) The Drainage District asked Seaboard Coast Line to draft a license agreement—which became the Tri-Party Agreement. (JA2065.)

- *CSX's predecessor's authorship of the Tri-Party Agreement.* Plaintiffs submitted a July 14, 1978, letter from Seaboard Coast Line to the Drainage District. In this letter, Seaboard Coast Line responded to the Drainage District, saying "[y]our application has been approved as proposed," and attaching a draft of the Tri-Party Agreement to be signed. (JA821.)

- *CSX's predecessor's own intent to benefit the south side of Lumberton.* Plaintiffs tendered an October 16, 1978, letter from the Superintendent of the Seaboard Coast Line, CSX's predecessor, in which he sent along a fully executed copy of the Tri-Party Agreement. And he stated again that the purpose of the Agreement was "to protect the City of Lumberton from flooding [by the] Lumber River." (JA2028.)

Plaintiffs also put forward other evidence of the parties' intent to benefit the

Plaintiffs, including:

- *Testimony by CSX itself about CSX's intent under the Tri-Party Agreement.* John Dillard, testifying as a Rule 30(b)(6) representative for CSX, testified that CSX's predecessor knew that the purpose of the Agreement was "[t]o protect the City of Lumberton of flooding of Lumber River during a 100-year frequency only." (JA1947–1948 ("Q: So Seaboard knew that that was the purpose of the agreement, right? A: Yes.").) He also testified that he did not disagree with the statement that the levee was specifically built for certain residents of Lumberton, in the southwest, to protect them from flooding. (JA1936–1939, JA1943.)

- *Testimony by CSX's former roadmaster.* A second witness, Robert Grooms, CSX's former roadmaster in Lumberton, testified that "CSX had an agreement between CSX Army Corps of Engineers and the City of Lumberton that in the event of a severe storm where flooding may be probable that they had the right to sandbag the ditches and the railroad to help protect the city from water coming in in that direction." (JA1792, JA1803.)

- *Testimony by the Drainage District.* Robert Price, a 30(b)(6) witness for the Robeson County Drainage District No. 1, testified that for residents and property owners in the flood plain, the construction of the dike was "the most meaningful program ever instituted by their municipality." (JA2122.) He also testified that "any agreements about the levee system . . . would be for the benefit of those businesses and residents in southwest Lumberton." (JA2170–2171.)

- *Testimony by the City of Lumberton.* Robert Armstrong, the City's 30(b)(6) witness, testified that the Lumberton levee system was specifically designed to protect west and south Lumberton. (JA2438.) And Henry Dixon Ivey, a longtime City employee, testified "the purpose of the dike

was to prevent flooding for south and west Lumberton." (JA2081.) He also testified that by forming the Tri-Party Agreement, the City directly intended to benefit "the property owners and businesses in southwest Lumberton." (JA2082.)

- *Evidence of past performance under the Agreement.* Plaintiffs put forward evidence that CSX allowed the gap to be closed between 2003 and 2005, under the Agreement, to provide flood control to the areas behind the levee. (JA1801–JA1812 (Grooms Dep.), JA1707–1708 (Johnson Dep.), Pl. App. Ex. 3, Johnson Depo., at 50:22-51:2; JA2010–2012 (photographs of sandbagging efforts).) CSX's intent to benefit the Plaintiffs can plainly be inferred.

- *Evidence that CSX did not intend to further obstruct the city in 2019.* Plaintiffs tendered a CSX e-mail from 2019—after this suit was filed—advising that the City should be permitted to close the gap. (JA1769–1771, JA1773–1774, JA2014 (e-mail stating "Make sure we [CSX] call Lumberton and find out when they want to put their sandbags out, If they do. Don't delay them.").) This is strong evidence that, again, CSX intended to benefit the Plaintiffs.

In its roughly two pages on standing, the district court discussed *none* of this evidence, except the July 14, 1978, letter from Seaboard Coast Line, which it summarily discounted as irrelevant. (JA4880.) That is not true when looking at the full circumstances of the levee construction and the Tri-Party Agreement; a reasonable jury could find that the July 14, 1978, letter is further evidence of Seaboard's intent to benefit the Plaintiffs.

*    *    *

This Court already held that Plaintiffs' plausible allegations survived Rule 12(b)(6). The evidence above shows that Plaintiffs can prove those plausible allegations and more. Plaintiffs submitted substantial evidence relating to the parties' intent to benefit the residents, businesses, and property owners in south and west Lumberton. The district court, erroneously hung up on the need for "active and direct dealings" between the Plaintiffs and the parties, refused to review Plaintiffs' evidence and did not apply it to the proper test handed down by this Court. That led to the district court's error in granting summary judgment. The district court should be reversed.

## IV. The district court erred in construing the Tri-Party Agreement to require performance by the City of Lumberton before it could be enforced.

The district court also erred in granting summary judgment to CSX on a third ground, holding that "Plaintiffs' contract claim fails on the merits" because the Tri-Party Agreement contains an unwritten condition precedent. (JA4880–JA4881.) The district court adopted CSX's argument that the City and the Drainage District never built an earthen dike alongside CSX's track prior to either storm, and that this constitutes a condition precedent which was never fulfilled. The district court held that, although conditions precedent "may be disfavored" under North Carolina law, the invisible one it read in the Tri-Party Agreement makes the entire Agreement unenforceable by anyone. (JA4881.) The district court's error is one of

contract construction, which this Court reviews *de novo. Sing Fuels Pte Ltd. v. M/V Lila Shanghai*, 39 F.4d 263, 269–70 (4th Cir. 2022).

The provisions of the Tri-Party Agreement the district court is referring to are in the opening "witnesseth" paragraph ("hereby grants . . . the right or license to construct . . . earthen dike"), JA76, as well as generally throughout the agreement. ( JA76–JA78.) A diagram of the "earthen dike" is attached to the Agreement. ( JA80.) It appears like this:



( JA80.) According to the concept envisioned in the Agreement, the City had the right to build the objects shown above ahead of any storm, with the City then erecting its temporary sandbag closure between those objects and across the tracks in risk of flood. ( JA77, ¶ 8(a) ("Said City shall also have the right . . . of closing said dike across said track and the roadbed thereof ONLY in the event the City of Lumberton is in eminent danger of flood").)

It is undisputed that the City has not yet completed the earthen dike. (JA911 (AECOM report).) However, that does not convert the Agreement's "right or license" to do so into a silent condition precedent that voids the entire Agreement. There's no time limit to build it, or necessary construction sequence, stated in the Agreement. The district court erred by construing the *right* to build a dike into a *requirement*, a condition precedent, to build the dike.

The district court was right that conditions precedent are indeed disfavored in North Carolina. *Davis v. Woodlake Partners LLC*, 230 N.C. App. 88, 99 (2013). In determining whether conditions precedent exist, North Carolina courts look to "the entire contract as construed in light of the circumstances of the case," which includes the nature of the contract, the relation of the parties, and "other evidence which is admissible" to determine the parties' intent. *Id.* (citing *Wade v. Lutterloh*, 196 N.C. 116, 120 (1928)).

North Carolina courts construe provisions as conditions precedent "only 'where the clear and plain language of the agreement dictates such construction.'" *Id.* (citing *Handy Sanitary Dist. v. Badin Shores Resorts Owners Assoc., Inc.*, 225 N.C. App. 296, 303 (2013)). The North Carolina Supreme Court has held that "the use of such words as 'when,' 'after,' 'as soon as,' and the like, gives clear indication that a promise is not to be performed except upon the happening of a stated event." *In re Foreclosure of Goforth Properties, Inc.*, 334 N.C. 369, 376 (1993).

Such words are simply not found in the Agreement. There is no discussion of sequencing the City's building a dike ahead of CSX's obligation to permit a closure of the line. And nothing CSX cited to the district court was to suggest otherwise. The Agreement simply granted the City the *right* to construct "portions" of a dike on either side of the tracks. Nothing in the Agreement *obligated* the City to build the full dike, or any portions, in order to have the right to close the tracks. The intent of allowing the "portions" to be pre-built was to benefit the City, by making it easier for the City to close the gap when a storm came. But that does not erase CSX's duty under the Agreement to permit the gap across its tracks to be closed.

For that reason alone, the district court erred in construing the Agreement to contain a disfavored condition precedent, and the district court should be reversed.

There are other reasons, relating to "the circumstances of the case," *Davis*, 230 N.C. App. at 99, why the district court's decision is wrong. They include:

- CSX has suffered no loss because the City has not yet built the earthen dike. It is not like the City's "failure" to do so yet constitutes hardship for CSX or constitutes a breach. And again, CSX simply could have exited the Agreement if there were loss due to the City's supposed non-performance.

- Plaintiffs showed how that the City would have been able to fully close the gap in the levee even without pre-building the "portions" of the dike licensed to the City. (JA1600 (Pls.' brief).) Plaintiffs' engineering expert testified to this in detail. (JA3230–JA3234, JA3244–JA3245.) In particular, the expert offered evidence that there were sufficient materials available, sufficient technical solutions such as HESCO barriers, and sufficient time to build. (JA3230–JA3234.) So even if building portions of the dike was a

condition precedent, it was not a *material* condition precedent that would allow CSX to escape its obligations—or at the very least, that was a disputed fact question that should not have been decided on summary judgment. *See*, *e.g.*, Restatement (Second) of Contracts § 229 ("To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange."); *Varel v. Banc One Capital Partners, Inc.*, 55 F.3d 1016, 1018 (5th Cir. 1995) (courts will excuse non-performance of a condition precedent if the condition's requirement will involve forfeiture or penalty and its existence or occurrence forms no essential part of the exchange); *Prince George's Cty. v. Local Gov't Ins. Tr.*, 879 A.2d 81, 96 (Md. 2005) (explaining that section 229 may be applied when condition precedent is not material).

- It is also relevant that, between 2003 and 2005, CSX acknowledged its obligation under the Agreement to allow the City to close the gap, and fulfilled it. (JA1802–1809 (overall), JA1808 ("there seemed to be an agreement").) In that era, CSX did not object to the City's not building the earthen dike. Indeed, the roadmaster who testified about what happened in this time had been at CSX more than 20 years, and he never complained about or even considered the lack of any portions of the dike. (JA1802–1812.) Again, that shows that, in light of the parties' dealings, constructing an earthen dike was not a condition precedent to performance, nor would it have been material to CSX. It also was evidence tending to show that even if there were a condition precedent, CSX waived its rights to enforce it. The district court rejected Plaintiffs' waiver argument, JA4881, but this evidence shows a genuine dispute that should not have been resolved on summary judgment.

In sum, the district court erred by imposing a contract-based rule on the City of Lumberton that is simply absent from the Agreement. That error should be

reversed, and this Court should construe the Agreement without any condition precedent. None exists.

## CONCLUSION

The Plaintiffs/Appellants ask the Court to reverse the district court's order, order the district court to deny summary judgment to CSX, and remand this case for trial.

## REQUEST FOR ORAL ARGUMENT

The Plaintiffs/Appellants respectfully request the opportunity to present oral argument.

Respectfully submitted,

/s/ William F. Cash III

William F. Cash III
  (Fla. Bar No. 68443)
**LEVIN, PAPANTONIO, RAFFERTY, PROCTOR, BUCHANAN, O'BRIEN, BARR, & MOUGEY, P.A.**
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Phone: 850-435-7059
bcash@levinlaw.com

Theodore J. Leopold
  (Fla. Bar No. 705608)
Diana L. Martin
  (Fla. Bar No. 624489)
**COHEN MILSTEIN SELLERS &
TOLL PLLC**
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408
Phone: 561-515-1400
tleopold@cohenmilstein.com
dmartin@cohenmilstein.com

Mark R. Sigmon
  (N.C. Bar No. 37762)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
900 West Morgan Street
Raleigh, NC 27603
Phone: 919-600-5000
msigmon@milberg.com

Counsel for Appellants

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITS

This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f), this brief contains 10,959 words.

This brief complies with the typeface and type style requirements because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14pt size Equity font.

/s/ William F. Cash III

William F. Cash III