**No. 23-1909**

---

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

JIMMY EDWARDS; ROBERT HUNT; DOLORES HUNT; CLIFFORD
MCKELLAR, JR.; EMMA MCKELLAR; WEST LUMBERTON BAPTIST
CHURCH; CURRIE CHAIN SAW, INC.; C.J.M. VENTURES, INC.; WILLIAM
LOCKLEAR, d/b/a Stricklands's Barbershop; TBL ENVIRONMENTAL
LABORATORY, INC.; SAMMY'S AUTO SALES, INC.; ERIC CHAVIS, on
behalf of themselves and all others similarly situated,
*Plaintiffs-Appellants,*

v.

CSX TRANSPORTATION, INC.,
*Defendant-Appellee.*

---

On Appeal from the United States District Court for the Eastern District
of North Carolina at Wilmington

---

## BRIEF OF APPELLEE
## CSX TRANSPORTATION, INC.

---

Henry L. Kitchin, Jr.
MCGUIREWOODS LLP
300 North Third Street, Suite 320
Wilmington, NC 28401

Scott L. Winkelman
April N. Ross
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone: (202) 624-2972
Fax: (202) 628-5116
swinkelman@crowell.com

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1909          Caption: Jimmy Edwards v. CSX Transportation, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

CSX Transportation, Inc.
(name of party/amicus)


who is          Appellee          , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                              ☑YES ☐NO
      If yes, identify all parent corporations, including all generations of parent corporations:

       CSX Corporation



3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                                  ☑YES ☐NO
      If yes, identify all such owners:
       CSX Corporation

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Scott L. Winkelman          Date: February 13, 2024

Counsel for: CSX Transportation, Inc.

Print to PDF for Filing

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................. 1

STATEMENT OF JURISDICTION ................................................... 2

STATEMENT OF ISSUES ................................................................. 2

STATEMENT OF THE CASE ............................................................ 3

I.    STATUTORY BACKGROUND ................................................ 3

II.   FACTUAL BACKGROUND ..................................................... 5

III.  PROCEDURAL HISTORY ...................................................... 7

SUMMARY OF ARGUMENT ........................................................ 10

ARGUMENT .................................................................................. 11

I.    STANDARD OF REVIEW ..................................................... 11

II.   THE DISTRICT COURT CORRECTLY HELD THAT THE
ICCTA PREEMPTS APPELLANTS' REMAINING CLAIM. ............... 12

    A.    Preemption Is Correctly Decided On Summary
Judgment. ............................................................... 13

    B.    The ICCTA Preempts State And Local Attempts To
Manage And Govern Rail Operations. ........................... 13

    C.    ICCTA Preemption Applies To Appellants' Breach Of
Contract Claim. ........................................................ 15

    D.    Appellants' Breach Of Contract Claim Unreasonably
Interferes With CSXT's Railroad Operations By Vesting
Unilateral Rail Construction And Rail Stoppage
Authority In Local Government. ................................... 18

        1.    The District Court Applied the Correct Test For
Implied Preemption Under The ICCTA. ............... 18

        2.    The District Court Correctly Applied the Law to
the Facts. ........................................................ 21

III.  THE DISTRICT COURT CORRECTLY HELD THAT
APPELLANTS LACK STANDING TO ENFORCE THE TPA ............... 31

    A.    The District Court Correctly Applied North Carolina's
Law On Third-Party Beneficiary Standing. .................... 31

    B.     The District Court Correctly Found No Evidence That
            All Contracting Parties Intended To Directly and
            Specifically Benefit Appellants ...................................................... 36

IV.   THE DISTRICT COURT PROPERLY CONSTRUED THE
      TPA TO REQUIRE PERFORMANCE BY THE CITY AS A
      CONDITION PRECEDENT, WHICH INDISPUTABLY
      NEVER OCCURRED. .............................................................................. 39

CONCLUSION .................................................................................................. 43

ORAL ARGUMENT STATEMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Am. Grading Co. v. CSX Transp.*,
  No. 2010CH20868, 2013 WL 5594762 (Ill. Cir. Ct., Cook Cnty.,
  Sept. 17, 2013) ..................................................................................13

*Atl. Coast Pipeline v. Nelson Co. Bd. of Supervisors*,
  No. 18-CV-00115, 2019 WL 2570530 (W.D. Va. June 21, 2019) ...................13

*Ballinger v. N.C. Agric. Extension Serv.*,
  815 F.2d 1001 (4th Cir. 1987) ...........................................................30

*Burgoyne, LLC v. Chicago Terminal R.R. Co.*,
  2020 IL App (1st) 190098, 169 N.E.3d 815 (Ill. Ct. App. 2020)................15, 23

*Canadian Nat. Ry. Co. v. Montreal, Maine & Atl. Ry., Inc.*,
  750 F. Supp. 2d 189 (D. Me. 2010) .....................................................23

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..........................................................................12

*CF Indus. v. Transcon. Gas Pipe Line*,
  448 F. Supp. 475 (W.D.N.C. 1978) .....................................................34

*Cipollone v. Liggett Grp., Inc.*,
  505 U.S. 504 (1992)..........................................................................14

*City of Auburn v. United States*,
  154 F.3d 1025 (9th Cir. 1998) ........................................................3, 14

*Crider v. Jones Island Club, Inc.*,
  554 S.E.2d 863 (N.C. Ct. App. 2001)...................................................43

*CSX Transp., Inc. v. City of Sebree*,
  924 F.3d 276 (6th Cir. 2019) ..................................................16, 17, 24

*Davis & Taft Architecture, P.A. v. DDR-Shadowline, LLC*,
  268 N.C. App. 327 (2019) .................................................................35

*DeLoach v. Lorillard Tobacco Co.*,
   391 F.3d 551 (4th Cir. 2004) ............................................................43

*DeMent v. Nationwide Mut. Ins. Co.*,
   544 S.E.2d 797 (N.C. Ct. App. 2001)................................................38

*Edwards v. CSX Transp., Inc.*,
   983 F.3d 112 (4th Cir. 2020) .....................................................*passim*

*Edwards v. CSX Transportation, Inc.*,
   No. 7:18-cv-00169-BO, 2033 WL 4877738 (E.D. N.C. July 31,
   2023) .......................................................................................................7

*Friberg v. Kan. City So. Ry. Co.*,
   267 F.3d 439 (5th Cir. 2001) ............................................................11

*Holshouser v. Shaner Hotel Grp. Props. One Ltd. P'Ship*,
   518 S.E.2d 17 (N.C. Ct. App. 1999)..................................................32

*Hospira Inc. v. Alphagary Corp.*,
   671 S.E.2d 7 (N.C. Ct. App. 2009)........................................33, 34, 35

*Houston, E. & W. Tex. Ry. Co. v. United States*,
   234 U.S. 342 (1914)......................................................................3, 14

*Hurd v. Hodge*,
   334 U.S. 24 (1948)..............................................................................15

*Jarman v. Twiddy & Co. of Duck.*
   889 S.E.2d 488 (N.C. Ct. App. 2023)................................................34

*Knight v. Boehringer Ingelheim Pharms., Inc.*,
   984 F.3d 329 (4th Cir. 2021) ............................................................13

*La. Pub. Serv. Commc'n v. FCC*,
   476 U.S. 355 (1986)............................................................................14

*Matternes v. City of Winston-Salem*,
   209 S.E.2d 481 (N.C. 1974) .......................................................38, 39

*Maynard v. CSX Transp., Inc.*,
   360 F. Supp. 2d 836 (E.D. Ky. 2004)..................................................4

*Merck Sharp & Dohme Corp. v. Albrecht*,
  139 S. Ct. 1668 (2019)......................................................................13

*Mitchell v. Data Gen. Corp.*,
  12 F.3d 1310 (4th Cir. 1993) ...........................................................30

*Nguyen v. CNA Corp.*,
  44 F.3d 234 (4th Cir. 1995) .............................................................12

*Noonan v. Consol. Shoe Co.*,
  84 F.4th 566 (4th Cir. 2023) ............................................................12

*Norfolk S. Ry. Co. v. City of Alexandria*,
  608 F.3d 150 (4th Cir. 2010) .......................................................4, 13

*Park Pet Shop, Inc. v. City of Chicago*,
  872 F.3d 495 (7th Cir. 2017) ...........................................................20

*PCS Phosphate Co. v. Norfolk S. Corp.*,
  559 F.3d 212 (4th Cir. 2009) ....................................................*passim*

*Pejepscot Indus. Park, Inc.*,
  Fin. Docket No. 33989, 2003 WL 21108198 (S.T.B May 9, 2003)..................21

*Pike v. Bruce Church, Inc.*,
  397 U.S. 137, 90 S.Ct. 844 (1970)..............................................19, 20

*Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Execs. Ass'n*,
  491 U.S. 490 (1989)...................................................................3, 14

*Rivera v. Philip Morris, Inc.*,
  395 F.3d 1142 (9th Cir. 2005) .........................................................14

*R.R. Ventures, Inc.*,
  Fin. Docket No. 33385, 2000 WL 1125904 (S.T.B. 2000) ..............................17

*Sanders v. Wilkerson*,
  285 N.C. 215, 204 S.E.2d 17 (1974) ................................................40

*Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*,
  228 F. Supp. 3d 1171 (W.D. Wash. 2017) ........................................21

*Thompson v. Potomac Elec. Power Co.*,
  312 F.3d 645 (4th Cir. 2002) ......................................................12, 30

*Union Pac. R.R. Co. v. City of Palestine*,
  517 F. Supp. 3d 609 (E.D. Tex. 2021), *aff'd*, 41 F.4th 696 (5th Cir.
  2022), *cert. denied*, 143 S. Ct. 579 (2023) ................................16, 17

*United States v. Baltimore & O. R. Co.*,
  333 U.S. 169 (1948) ........................................................................16

*W. Lumberton Baptist Church v. CSX Corp.*,
  No. 7:18-cv-00178-BO (E.D.N.C. Oct. 4, 2018) ...............................8

*Wedemeyer v. CSX Transp., Inc.*,
  850 F.3d 889 (7th Cir. 2017) ...........................................................23

**Statutes**

28 U.S.C. § 1291 ...................................................................................2

28 U.S.C. § 1332(a) ..............................................................................2

28 U.S.C. § 1332(d)(2) ..........................................................................2

49 U.S.C. § 701(a) .................................................................................4

49 U.S.C. § 702 .....................................................................................4

49 U.S.C. §§ 10101 *et seq.* ....................................................................3

49 U.S.C. § 10501(b) .............................................................................4

**Rules**

Fed.R. Civ. P. 56 ............................................................................28, 30

Fed. R. Civ. P. 56(a) ...........................................................................12

Fed. R. Civ. P. 56(c) ...........................................................................30

**U.S. Constitution**

U.S. Const. art. VI, cl. 2 .....................................................................14

**Other Authorities**

Restatement of the Law of Property, Ch. 43, Licenses, § 512 ................................40

Webster, Real Estate Law in North Carolina, § 310 (1971)....................................40

# INTRODUCTION

Appellants are twelve residents and businesses who own property that was allegedly damaged when rains from Hurricanes Matthew (in 2016) and Florence (in 2018) caused the Lumber River to overflow and flood parts of Lumberton, North Carolina ("the City"). Appellee CSX Transportation, Incorporated ("CSXT") is a private railroad that owns railroad tracks that have run through Lumberton for more than 150 years. Appellants seek to hold CSXT liable for property damage they allegedly suffered from these natural disasters.

This Court has already affirmed the dismissal of plaintiffs' tort claims. In their remaining breach of contract claim, plaintiffs cling to a 45-year-old public works agreement between the City; Robeson County Drainage District No. 1 ("Drainage District"); and CSXT's predecessor, Seaboard Coast Line Railroad Company ("Seaboard"), referred to here as the "Tri-Party Agreement" ("TPA"). The TPA grants local government entities a limited license to build an earthen dike on railroad property, which the local entities never built. Crucially, plaintiffs are not parties to that agreement. Undeterred, plaintiffs declare themselves entitled to enforce this contract decades later and to reform it to impose sweeping flood-protection obligations on CSXT.

Appellants' contract claim, like their dismissed tort claims, runs headlong into the Interstate Commerce Clause Termination Act of 1995 ("ICCTA"). The ICCTA

preempts state law enforcement actions that seek to manage and govern rail operations, including track usage and construction. Courts have dismissed similar suits as preempted at summary judgment, and the district court correctly reached that conclusion here.

Beyond preemption, Appellants lack standing to enforce the TPA, as they are not intended and direct third-party beneficiaries of the agreement. And in any event, the City never fulfilled a necessary condition precedent of the agreement.

The district court's grant of summary judgment should be affirmed.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this appeal of the district court's final decision granting summary judgment under 28 U.S.C. § 1291. The district court properly exercised its jurisdiction over those claims under 28 U.S.C. §§ 1332(a) and 1332(d)(2).

## STATEMENT OF ISSUES

1.     Did the district court correctly hold that the ICCTA, which grants exclusive jurisdiction over rail operation, construction, and management to the federal Surface Transportation Board, impliedly preempts Appellants' contract claim?

2.     Did the district court correctly grant summary judgment on Appellants' breach of contract claim where Appellants are neither parties to the agreement nor intended direct third-party beneficiaries with standing to enforce the agreement?

3.     Did the district court correctly grant summary judgment on Appellants' breach of contract claim because the City and Drainage District never fulfilled the condition precedent of building the earthen dike, and thus, by definition, there was no dike to close and CSXT could not breach the TPA?

## STATEMENT OF THE CASE

## I.     STATUTORY BACKGROUND

Railroads are subject to the regulatory authority of Congress under the Commerce Clause. *See Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Execs. Ass'n*, 491 U.S. 490, 510 (1989); *Houston, E. & W. Tex. Ry. Co. v. United States*, 234 U.S. 342, 350-52 (1914). Congress initially asserted federal authority over the railroad industry by enacting the Interstate Commerce Act, ch. 104, 24 Stat. 379 (1887), among the most pervasive and comprehensive federal regulatory schemes. *City of Auburn v. United States*, 154 F.3d 1025, 1029 (9th Cir. 1998).

Federal regulation of the industry expanded further when Congress enacted the Interstate Commerce Commission Termination Act of 1995, 49 U.S.C. §§ 10101 *et seq.* ("ICCTA"), including within it an express preemption of state and local regulation of rail transportation. With its enactment of the ICCTA, Congress

intended to "significantly reduce state and local regulation of railroads." *Maynard v. CSX Transp., Inc.*, 360 F. Supp. 2d 836, 839 (E.D. Ky. 2004). To this end, Congress established the Surface Transportation Board ("STB") as an agency within the United States Department of Transportation with authority to regulate railroad operations. *See* 49 U.S.C. § § 701(a), 702.

ICCTA Section 10501 gives the STB exclusive jurisdiction over:

(1)     transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2)     the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State….

49 U.S.C. § 10501(b). Section 10501 concludes that the STB's jurisdiction is "exclusive" and "preempt[s] the remedies provided under Federal or State law." *Id*

Thus, the STB "has broad jurisdiction over 'transportation by rail carriers,'" including "exclusive jurisdiction over . . . the construction, acquisition, operation . . . of . . . tracks, or facilities.'" *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 157 (4th Cir. 2010) (quoting 49 U.S.C. § 10501(b)) (internal quotation marks and citation omitted).

## II.    FACTUAL BACKGROUND

CSXT and its predecessors have operated a rail line through Lumberton for more than 150 years. JA 29. Approximately 100 years after the rail line was built, the government built the portion of Interstate 95 that runs through Lumberton. Interstate 95 sits on an elevated support berm with highway bridges passing over both the railroad tracks and a neighboring public roadway, VFW Road. JA 25. Appellants allege this highway construction created a "gap" in the City's levee system. The so-called "gap" (the area beneath the highway bridge) left in the "levee" (the highway support berm) allows not only CSXT's railroad tracks, but also the VFW Road, to pass underneath the highway. JA 25. CSXT had no role in creating that "gap," since its track structures long predate the highway.

In 1978, the City of Lumberton, North Carolina ("the City"), the Robeson County Drainage District No. 1 ("the Drainage District"), and CSXT's predecessor the Seaboard Coast Line Railroad Company ("Seaboard") entered into an agreement, referred to here as the Tri-Party Agreement ("TPA"), JA 75. The TPA grants a license from Seaboard to the City and the Drainage District to construct, at their expense, a six-foot high earthen dike on railroad property adjacent to the railroad tracks. JA 75-76. The TPA also provides that upon proper notice and in the event of imminent flooding, the City shall have "the right and privilege of closing said dike across said track," thereby halting all rail operations until the City decides at its

discretion to "open said dike." JA 77. In consideration of the license, the TPA provides that except for its own negligence, the railroad will be indemnified and held harmless by the City and Drainage District for any costs, injuries, loss, or damage to any person or property connected in any way with the construction, maintenance, presence, or failure of the dike on railroad property. JA 76.

None of the Appellants is a party to the TPA. JA 75-81. The TPA makes no mention of Appellants. JA 75-81 No Appellant was involved or consulted on the formation, negotiation, or execution of the TPA or its terms. JA 31; JA 32; JA 75. None of the Appellants had heard of the TPA before this litigation. *See e.g.*, JA 189; JA 200; JA 213; JA 222.

There is also no evidence in the record that Seaboard executed the TPA with the intent to directly or specifically benefit these Appellants, or to directly or specifically benefit a defined class of individuals in the City, or elsewhere. And there is no testimony from any other party to the TPA, from any party's negotiators, or even from third parties showing that all contracting parties intended to confer third-party beneficiary status on anyone.

The City had not constructed the six-foot earthen dike on CSXT's property at the I-95 underpass, as the TPA permitted four decades earlier, when Hurricanes Matthew and Florence hit Lumberton in 2016 and 2018, respectively. JA 33-34; *see*

*also* JA 936-964; JA 572-575. To this day, the earthen dike has not been erected. JA 33-34; *see also* JA 936-964; JA 572-575. There was thus no dike to close.

In advance of Hurricane Matthew, the City did not ask CSXT to act under the TPA, or to grant access to close the tracks. JA 342-343; JA 340; JA 341; JA 353-354. In advance of Hurricane Florence two years later, the City attempted to halt CSXT's rail operations in Lumberton *a full week before the storm*, and to erect a physical barrier across the track. JA 344. Erecting physical barriers on CSXT's track significantly and directly impedes rail operations, disrupts CSXT's ability to move hazardous materials and other freight out of harm's way, and interrupts CSXT's role in STRACNET, the United States military's Strategic Rail Corridor Network. *See* JA 367-368.

Appellants claim that CSXT's alleged refusal to allow the City to erect a sandbag berm across the tracks in advance of storms breached the TPA's provision granting the City the right to close "said dike" under certain conditions, even though no dike was built and thus there is no dike to close.

## III.   PROCEDURAL HISTORY

In late 2018, residents and businesses in Lumberton filed three nearly identical putative class action lawsuits against CSXT.[1] After CSXT moved to dismiss the

---

[1] *Moore v. CSX Transportation, Inc.*, No. 7:18-cv-00177-BO (E.D.N.C. Oct. 4, 2018); *Edwards v. CSX Transportation, Inc.*, No. 7:18-cv-00169-BO, 2033 WL (Continued…)

original complaints, plaintiffs consolidated the three cases and filed an amended consolidated complaint on February 28, 2019 (the "Amended Complaint" or "Complaint"). In their Amended Complaint, Appellants brought claims for breach of contract, breach of "a railroad corporation's duty to protect the public good," negligence, and "trespass and nuisance." JA 61-70. CSXT again moved to dismiss the Amended Complaint.

On July 16, 2019, the district court granted CSXT's motion to dismiss, dismissing all claims. Appellants appealed that decision and on December 15, 2020, this Court issued its decision affirming dismissal of Appellants' tort claims as preempted under the ICCTA, but remanding Appellants' contract claim. *Edwards v. CSX Transp., Inc.*, 983 F.3d 112 (4th Cir. 2020) (hereinafter "*Edwards I*"). This Court observed that while plaintiffs' breach of contract claim survived dismissal on the pleadings, it "might still be impliedly preempted." *Id.* at 121 n.11. And this Court found that the duties Appellants seek to impose fall squarely within the scope of the STB's exclusive jurisdiction, noting "[i]ndeed, it is hard to view their claims as anything other than direct attempts to 'regulate' railroading. Far from 'incidentally' affecting rail construction and operation, the claims go to the heart of the Surface Transportation Board's exclusive jurisdiction: whether CSX should have allowed its

---

4877738 (E.D. N.C. July 31, 2023); *W. Lumberton Baptist Church v. CSX Corp.*, No. 7:18-cv-00178-BO (E.D.N.C. Oct. 4, 2018).

tracks to be barricaded . . . ." (*id*. at 122-23); *see also id*. at 123 ("Plaintiffs fault CSX for not closing an otherwise open rail line . . . . Those are things only a railroad can do. And that conduct is clearly encompassed by the plain language of the [ICCTA]."). This Court noted further that, while it remanded the breach of contract claim for discovery, evidence of the intent of the contracting parties would be "key" to the third-party standing question, because "merely incidental beneficiaries may not maintain an action on a contract" (*id*. at 117-18), that the contract must be "construe[d] . . . strictly against the third-party seeking enforcement" (*id*. at 118), and that "[a] lack of evidence of 'active and direct dealings' might ultimately sink [plaintiffs'] third-party beneficiary claim" on the merits (*id*. at 119).

Extensive discovery ensued upon remand to the district court.

On January 27, 2023, with discovery completed, CSXT moved for summary judgment, explaining that Appellants' breach of contract claim is impliedly preempted by the ICCTA; that Appellants are not third-party beneficiaries under North Carolina law and therefore lack standing to enforce the TPA; that because the City and the Drainage District failed to build the dike contemplated by the TPA, CSXT has no legally enforceable duty to allow the City to close the non-existent dike; and that Appellants cannot prove causation. On July 27, 2023, the district court issued its opinion and order granting CSXT's motion for summary judgment on three independently dispositive grounds. JA 4872 -4881.

First, the district court held that plaintiffs' breach of contract claim is impliedly preempted by the ICCTA. The court, following standard summary judgment protocol, found that the "evidence supports the conclusion that the TPA unreasonably interferes with rail transportation[,]" and "[p]laintiffs have not proffered evidence which would create a genuine issue of material fact" on this issue. JA 4877. Second, the district court rightly concluded that plaintiffs are not third-party beneficiaries to the TPA because the contracting parties did not specifically intend to confer a legally enforceable benefit on them. JA 4878-4880. And third, the district court found that plaintiffs' contract claim failed independently on the merits because the City of Lumberton never built the earthen dike that was the "lynchpin" of the TPA. JA 4880. Without an earthen dike, there could be no enforceable contractual right to close "said dike" in the event of a flooding emergency. The district court accordingly entered final judgment for CSXT.

Appellants then noticed this appeal. JA 4884-4886.

## SUMMARY OF ARGUMENT

The district court's grant of summary judgment to CSXT on three independent, equally dispositive grounds should be affirmed.

*First*, as the district correctly found, plaintiffs' breach of contract claim is preempted by the ICCTA. The law of this case, the plain language of the TPA, and the undisputed record evidence confirm this Court's previous finding that the duty

plaintiffs seek to impose on CSXT—to allow the City of Lumberton to barricade its railroad tracks upon request—runs headlong into the preemptive effect of the ICCTA.

*Second*, the district court correctly found that as non-parties to the 1978 Tri-Party Agreement ("TPA"), plaintiffs have no standing to enforce that agreement. There is no evidence that all parties to the TPA (and the law requires it be all) intended to confer legally enforceable rights for all time on residents and business owners in Lumberton, nor is there any evidence of contemporaneous "active and direct dealings" between these Appellants, or any member of a supposed beneficiary class, and the contracting parties.

*Third*, even if plaintiffs had standing, the TPA does not impose the responsibilities on CSXT that plaintiffs suggest because the City of Lumberton failed to build the dike contemplated by that agreement. As a result, CSXT has no legally enforceable duty to allow the City to close the non-existent dike.

## ARGUMENT

### I.  STANDARD OF REVIEW

"Whether a state statute or common law cause of action is preempted by federal law is a question of law" subject to *de novo* review by the Court of Appeals. *Friberg v. Kan. City So. Ry. Co.*, 267 F.3d 439, 442 (5th Cir. 2001).

This Court reviews the district court's grant of summary judgment *de novo*, applying the same legal standards as the district court. *Nguyen v. CNA Corp.*, 44 F.3d 234, 236 (4th Cir. 1995). Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-movant to present evidence, not mere rhetoric – in particular, "evidence on which the jury could reasonably find for" the non-moving party. *Noonan v. Consol. Shoe Co.*, 84 F.4th 566, 572 (4th Cir. 2023). The non-moving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks and citation omitted). "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [plaintiffs'] case." *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (internal quotation marks and citation omitted).

## II.   THE DISTRICT COURT CORRECTLY HELD THAT THE ICCTA PREEMPTS APPELLANTS' REMAINING CLAIM.

The district court correctly found Appellants' contract claim preempted by the ICCTA, which vests in the STB exclusive authority over the design, construction, and operation of tracks and rail facilities – precisely the subjects that Appellants seek to regulate through this litigation.

## A. Preemption Is Correctly Decided On Summary Judgment.

Preemption is a question of law for the court to decide. *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1676 (2019) ("We here decide that a judge, not the jury, must decide the pre-emption question."); *see also Knight v. Boehringer Ingelheim Pharms., Inc.*, 984 F.3d 329, 337 (4th Cir. 2021) ("Preemption is a question of law, which [judges] review de novo."). ICCTA preemption, both express and implied, is thus properly and regularly resolved on summary judgment. *See, e.g.*, *Norfolk S. Ry Co.*, 608 F.3d at 159 (finding on summary judgment that the ICCTA preempted local municipal ordinance and permit regulating operations of rail facility); *see generally Atl. Coast Pipeline v. Nelson Co. Bd. of Supervisors*, No. 18-CV-00115, 2019 WL 2570530, at *6 (W.D. Va. June 21, 2019) ("Generally, 'when a case presents a pure question of law as to federal preemption, the case should be resolved at the summary judgment stage.'") (citation omitted); *Am. Grading Co. v. CSX Transp.*, No. 2010CH20868, 2013 WL 5594762 (Ill. Cir. Ct., Cook Cnty., Sept. 17, 2013) (granting summary judgment finding that the ICCTA preempted enforcement of 1950 and 1953 agreements granting the right to install a private railroad crossing).

## B. The ICCTA Preempts State And Local Attempts To Manage And Govern Rail Operations.

Under the Supremacy Clause of the Constitution, "Congress may preempt state common law as well as state statutory law through federal legislation."

*Edwards I*, 983 F.3d at 120 (quoting *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005)); U.S. Const. art. VI, cl. 2. "Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law[.]" *La. Pub. Serv. Commc'n v. FCC*, 476 U.S. 355, 368 (1986).

Railroads are subject to the regulatory authority of Congress under the Commerce Clause, *see, e.g.*, *Pittsburgh & Lake Erie R.R. Co. v. Ry. Lab. Execs. Ass'n*, 491 U.S. 490, 510 (1989); *Houston, E. & W. Tex. Ry. Co. v. United States*, 234 U.S. 342, 350–52 (1914), and the Supreme Court "repeatedly has recognized the preclusive effect of federal legislation" in the area of rail regulation. *City of Auburn v. United States*, 154 F.3d 1025, 1029 (9th Cir. 1998). Like state statutes, state common-law claims, such as Appellants' claim here, are a form of state regulation to which preemption applies. *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 521-22 (1992); *Edwards I*, 983 F.3d at 121-22 (joining "in that sensible view" that ICCTA preemption applies to common law claims).

The ICCTA has "both express and implied preemptive effects." *Edwards I*, 983 F.3d at 121. The statute expressly preempts "those laws and actions 'that may reasonably be said to have the effect of 'managing' or 'governing' rail transportation.'" *Id.* (quoting *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 217-22 (4th Cir. 2009)). State laws or actions also "may be impliedly preempted if,

in application, they have the effect of unreasonably interfering with railroad transportation." *Id.* (internal quotation marks and citation omitted).

The question in this appeal is whether, as the district court found, Appellants' attempt through their contract claim to require CSXT to allow the City of Lumberton a unilateral right to erect temporary or permanent flood barriers on CSXT's rail property, and use those barriers to unilaterally halt rail traffic, is an unreasonable interference with rail operations and thus impliedly preempted by the ICCTA. With the evidence now in, and with Appellants having failed their burden of establishing any genuine dispute as to any material fact, the answer is "yes."

## C.     ICCTA Preemption Applies To Appellants' Breach Of Contract Claim.

Nearly 80 years ago, the Supreme Court declared:

> The power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United States as manifested in the Constitution, treaties, federal statutes, and applicable legal precedents. Where the enforcement of private agreements would be violative of that policy, it is the obligation of courts to refrain from such exertions of judicial power.

*Hurd v. Hodge*, 334 U.S. 24, 34-35 (1948). Thus, while private parties are generally free to enter into contractual agreements, they "cannot voluntarily contract away [the STB's] jurisdiction." *Burgoyne, LLC v. Chicago Terminal R.R. Co.*, 2020 IL App (1st) 190098, ¶ 34, 169 N.E.3d 815, 827 (Ill. Ct. App. 2020) (alteration in original).

While some voluntary contracts avoid preemption because they do not intrude upon federal interests, ICCTA preemption applies to contract claims such as this one that directly and unreasonably burden or interfere with rail operations. *See, e.g.*, *CSX Transp., Inc. v. City of Sebree*, 924 F.3d 276, 285 (6th Cir. 2019) (ICCTA preempts enforcement of 1979 settlement agreement restricting construction and maintenance of rail lines); *Union Pac. R.R. Co. v. City of Palestine*, 517 F. Supp. 3d 609, 627-31 (E.D. Tex. 2021), *aff'd*, 41 F.4th 696 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 579 (2023) (ICCTA both expressly and impliedly preempts agreement requiring railroad to maintain employees in a particular city because it unreasonably burdens and interferes with rail operations); *see also United States v. Baltimore & O. R. Co.*, 333 U.S. 169, 177 (1948) (parties may not enter into trackage rights agreements that abrogate rights and responsibilities under the statutory provisions of the Interstate Commerce Act).[2]

---

[2] In *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 221 (4th Cir. 2009), this Court held that an agreement between a rail company and a mine requiring the former to pay to relocate its industrial spur track if it interfered with mining operations was not preempted by the ICCTA. But this Court carefully limited that holding to its specific facts: "This is not to say that a voluntary agreement could never constitute an 'unreasonable interference' with rail transportation, but the facts of this case indicate that any interference is not unreasonable . . . ." *Id*. Unlike the agreement in *PCS Phosphate*, which imposed only additional costs on the railroad and would "not affect the ability of [the railroad] to comply with its legal obligation to serve any existing customer then on its line," Appellants claim the TPA requires CSXT to halt its rail operations altogether at the City's request. *See id*. at 222 (Continued…)

Preemption of private agreements by the ICCTA is especially appropriate where, as here, the contract predates the ICCTA by decades and directly conflicts with Congress's subsequent intent to do away with the patchwork of local and state obligations and impose a unified, federal framework for interstate rail transportation. As one court explained in finding the ICCTA preempted a decades-old contract between local government and a railroad's predecessor:

> [T]he changed circumstances since 1954 demonstrate that, to the extent the Agreement was voluntary, it nonetheless interferes with rail transportation today. To be sure, contracts that were freely negotiated between sophisticated business parties should not be easily set aside, as they reflect a market calculation that the benefits of the agreement outweigh the costs. But a once-voluntary contract may nevertheless unreasonably interfere with rail transportation where "circumstances have materially changed since the agreement was voluntarily entered into by its predecessor" . . . including the passage of the ICCTA.

*Union Pac. R.R. Co.*, 517 F. Supp. 3d at 632 (internal citation omitted) (quoting *City of Sebree*, 924 F.3d at 286). As the Sixth Circuit held in *CSX Transportation, Inc. v. City of Sebree*, where a contract "was entered into in 1979, over fifteen years before the [ICCTA] was enacted" and evidence showed that enforcement of the agreement would unreasonably burden or interfere with rail operations today, the agreement "is preempted under the [ICCTA] and therefore void as against public policy." *City of Sebree*, 924 F.3d at 286 (citing *R.R. Ventures, Inc.*, Fin. Docket No. 33385, 2000

---

(internal quotation marks omitted). Halting rail traffic and closing tracks obviously interferes directly with rail operations.

WL 1125904, at *2 (S.T.B. 2000) ("While the Board encourages privately negotiated agreements, any contractual restrictions that unreasonably interfere with common carrier operations are deemed void as contrary to public policy.")).

The TPA cannot withstand the preemptive effect of federal rail law. It hails from a bygone era, one where the STB did not exist and where negotiation with local government and civil actions were the tools used to declare and enforce local limitations on rail activity. The parties to the TPA could not have intended to set aside or upend federal rail law when that law did not exist at the time the contract was formed, or for decades after. Regardless of whether the City could impose rail-stoppage obligations (through contract or otherwise) on CSXT's predecessor in the 1970s, those local obligations were preempted and void after Congress enacted the ICCTA in 1995.

### D. Appellants' Breach Of Contract Claim Unreasonably Interferes With CSXT's Railroad Operations By Vesting Unilateral Rail Construction And Rail Stoppage Authority In Local Government.

#### 1. The District Court Applied the Correct Test For Implied Preemption Under The ICCTA.

Contrary to Appellant's assertion, the district court articulated and applied the correct test for ICCTA implied preemption. "[T]he generally accepted test for ICCTA implied or conflict preemption [asks]: does the enforcement action unreasonably interfere with rail transportation?" JA 4876 (quoting *PCS Phosphate Co.*, 559 F.3d at 220-21). The district court stated further that "[w]hether interference

is unreasonable 'requires a factual assessment of the effect of providing the claimed remedy.'" This Court articulated this same test in this very case. *Edwards I*, 983 F.3d at 121 n.12.

Nonetheless, Appellants contend that the implied preemption test requires something more—that the court must weigh "the burden on interstate commerce imposed by the regulation" against "the local benefits it provides." App. Br. at 20. This is not the law. Appellants derive their supposed "local benefits" balancing test from *PCS Phosphate*. *Id*. But in that case, this Court articulated precisely the same test for ICCTA implied preemption that the district court applied in this case, stating: "the determination of whether the action constitutes an 'unreasonable interference' requires a factual assessment of the effect of providing the claimed remedy." *PCS Phosphate*, 559 F.3d at 220-21. This Court did refer in passing to the so-called "*Pike* test*," whereby "*[i]n the context of the Commerce Clause*, whether a particular regulation imposes an 'unreasonable burden' on interstate commerce depends on whether the burden on interstate commerce imposed by the regulation outweighs the local benefits it provides." *Id*. at 221 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844 (1970)) (emphasis added). But nowhere does *PCS Phosphate* suggest this Court is importing a new "local benefits" balancing test into ICCTA preemption analysis, or explain how *Pike* has any applicability to ICCTA preemption (it does not).

Nor to the best of CSXT's knowledge has this Court, or any other court anywhere nationwide *ever* held that *Pike*, or the balancing test it articulates, applies to questions of ICCTA preemption. To the contrary, *Pike*'s balancing test applies "for purposes of dormant commerce clause analysis" which is indisputably not at issue here.[3] Thus, plaintiffs' entire argument that the district court "got this law wrong" is itself an error of law, arising from plaintiffs' own invention of a new "balancing" test that has no place in federal preemption doctrine.

In sum, the ICCTA's test for preemption remains just as this Court and the district court have repeatedly stated: "does the enforcement action 'unreasonably

---

[3] As the Seventh Circuit explained in *Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495, 501-502 (7th Cir. 2017), under the dormant commerce clause:

> laws that are facially nondiscriminatory but have "mild disparate effects and potential neutral justifications" are analyzed under *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), which established a balancing test that requires the reviewing court to weigh the burden on interstate commerce against the nature and strength of the state or local interest at stake. More specifically, *Pike* holds that when a state or local statute "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits…." . . . [The] *Pike* balancing is triggered *only* when the challenged law *discriminates* against interstate commerce in practical application. *Pike* is not the default standard of review for any state or local law that affects interstate commerce.

(internal citations omitted). Neither the dormant commerce clause, nor *Pike*, has any application to the question whether ICCTA implied preemption applies in this case.

interfere' with rail transportation?" *PCS Phosphate Co.*, 559 F.3d at 220-21 (alteration and citation omitted). If the answer is yes, preemption applies and the exclusive remedies are those available through the STB; no "balancing" of "local burdens" is involved. This test applies equally to claims sounding in contract as those sounding in state regulatory action: "Where a restriction or limit on a rail carrier's activities arises not from state regulation but from a voluntary contractual agreement, the same basic analysis applies. Such agreements are enforceable as long as they do not interfere with the carrier's operations and/or unreasonably burden interstate commerce." *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 228 F. Supp. 3d 1171, 1177 (W.D. Wash. 2017) (citing *Pejepscot Indus. Park, Inc.*, Fin. Docket No. 33989, 2003 WL 21108198, at *5 (S.T.B May 9, 2003)); *see also PCS Phosphate*, 559 F.3d at 220-21 (applying unreasonable interference test for ICCTA implied preemption to breach of contract claim).

### 2. The District Court Correctly Applied the Law to the Facts.

The district court not only applied the correct law, it correctly applied that law to the record evidence and granted summary judgment in CSXT's favor because CSXT demonstrated with uncontroverted evidence that imposing on CSXT a perpetual burden to allow the City unilateral authority to physically barricade CSXT's rail tracks unreasonably interferes with CSXT's rail operations, and Appellants failed to rebut that evidence. This Court should affirm.

**First**, **the law of the case holds this is unreasonable interference.** This Court already found, in this very case, that the duty Appellants seek to impose on CSXT—to allow the City to barricade the tracks of Lumberton in response to a perceived flood risk—constitutes an unreasonable interference with rail operations. In affirming dismissal of Appellants' tort claims, which sought to impose the same duties on CSXT, this Court held that those claims were direct attempts to regulate the railroad: "Indeed, it is hard to view their claims as anything other than direct attempts to 'regulate' railroading. Far from 'incidentally' affecting rail construction and operation, the claims go to the heart of the Surface Transportation Board's exclusive jurisdiction: whether CSX should have allowed its tracks to be barricaded . . . ." *Edwards I*, 983 F.3d at 122-23; *see also id*. at 123 ("Plaintiffs fault CSX for not closing an otherwise open rail line . . . . Those are things only a railroad can do. And that conduct is clearly encompassed by the plain language of the [ICCTA]."). That is the law of this case, and Appellants' contract claim challenges the same conduct—and would impose the same direct obligations—as their tort claims.

**Second**, **the TPA, on its face, confirms its unreasonable interference with rail operations.** Section 8(a) expressly confers upon local authorities a unilateral "right and privilege" of closing "said dike" (which does not exist) by building a barrier across CSXT rail property during flood emergencies, thus halting all rail traffic. *See* JA 77. Section 8(b) then gives the City, and only the City, the unfettered

right to decide when CSXT may reopen its tracks to business, and to actually do the reopening: "Said City hereby agrees that when the flooding has receded **said City will open said dike** across said track and roadbed thereof …." *See* JA 77 (emphasis added). The City is thus empowered to decide when tracks can be used and when they cannot be used. The City thereby supplants the railroad, and supplants the STB, the lone body with authority over such decisions. Intrusion into rail operations could hardly be clearer. And because the City's "right and privilege" to stop rail movement turns on nothing but its own discretion and subjective assessment of flood risk, its unreasonableness is also not in serious question, as the district court correctly found.[4] JA 4876.

*Third*, **CSXT presented abundant, undisputed evidence of unreasonable interference.** The TPA shifts to local government the right to "close the railroad." These are not CSXT's words: they are the sworn testimony of the authorized city

---

[4] Notably, courts considering ICCTA preemption of contracts regularly find easements preempted – and the TPA is a form of an easement. *See, e.g.*, *Wedemeyer v. CSX Transp., Inc.*, 850 F.3d 889, 897 (7th Cir. 2017) (breach of contract claim seeking to enforce easement preempted by the ICCTA); *Canadian Nat. Ry. Co. v. Montreal, Maine & Atl. Ry., Inc.*, 750 F. Supp. 2d 189, 196 (D. Me. 2010) (enforcement of easement preempted by the ICCTA); *Burgoyne*, 2020 IL App (1st) 190098, ¶ 34 (breach of contract claim to enforce easement unreasonably interfered with railroad operations and was thus preempted by the ICCTA). This makes sense, for an easement permits a contracting party to enter another's property and do things upon it. Such operational agreements are thus distinguished from contracts that impose only monetary burdens on railroads and which may survive preemption.

executive when deciding whether to invoke the TPA. *See* Deposition of Robert P. Armstrong, Jr. ("Armstrong Dep.") dated Mar. 18, 2022, JA 345("[T]he city manager called me and said 'Let's close the railroad.'"). Indeed, the very point of this lawsuit is Appellants' notion that CSXT breaches the TPA whenever it refuses permission to local officials to "close the railroad"—*i.e.* to enter upon CSXT's property, construct a sandbag structure on CSXT's railroad tracks, and permit the City to close CSXT's rail tracks and abort all rail operations when the City unilaterally determines that floods might be looming. *See, e.g.*, JA 33-34, JA 37-38, JA 62, JA 99-106, JA 237.[5] Like the pre-ICCTA settlement agreement in *City of Sebree*, enforcing the TPA as Appellants desire would permit the City "to manage or govern rail transportation in a direct way," the epitome of preempted conduct. *Edwards I*, 983 F.3d at 122 (internal quotation marks and citation omitted).

CSXT also presented uncontroverted evidence that the City's supposed "right and privilege" to barricade tracks directly interferes with CSXT's determinations on when to open and close its rail line, undermining CSXT's ability to operate uniformly across its interstate rail network and efficiently conduct rail operations. Mr. Ricky Johnson, CSXT's designated corporate representative and former Vice President of Operations, testified that before closing its track in advance of

---

[5] Notably, the City itself has not sued to enforce the TPA in connection with these events.

impending coastal North Carolina storms, CSXT must evacuate hazardous materials and other freight moving on trains coming from Wilmington, with the only available route being through Lumberton.

> Q. Do you know anything about CSX's resistance to [the City's] efforts?
>
> A. The only thing I recall is that – can't recall which storm – was that there was some press stuff was broadcast. I think it was the governor of North Carolina or somebody in his staff.
>
> And when they reached out – and that's the first that, I would say, at a higher level, that we were aware of an issue. And we made sure that Lumberton had access to do what they needed to do once we got all of hazardous material that we were trying to evacuate from Wilmington and other areas in the town of Wilmington.
>
> Once we got that to a location to where it wouldn't harm communities, we gave them access to build a temporary structure, even though, you know, just like we do with other areas, they didn't have an agreement to do so, but we allowed them to do that.

*See* Deposition of Ricky Johnson (JA 362), June 15, 2022, at 81:1-18. Relocating hazardous materials out of a storm's path is a core function of operating the railroad, crucial to ensuring that communities and cargo are safe and secure. Another CSXT corporate representative, John Dillard, similarly testified:

> There was a lot going on in the days before Hurricane Florence, including railroad operations. . . on that Wilmington [S]ubdivision. Particularly, that is so close to the port of Wilmington, there are hazardous materials that

are on that line, so there were a number of concerns to consider . . . from CSX's perspective.

*See* Deposition of John Dillard (JA 384-385), Aug., 31, 2022, at 156:23-157:5. Yet, under the TPA as Appellants would enforce it, CSXT is barred from acting on or even considering these stark operational realities: if the City wishes to "close the railroad," and gives the required notice, CSXT and the STB's authority over rail operations ends, in contravention of the Supremacy Clause.

CSXT proffered additional evidence, again uncontested by Appellants, that allowing local government to dictate rail closures in Lumberton further unreasonably interferes with rail operations because CSXT's rail line through Lumberton is part of STRACNET, the U.S. military's Strategic Rail Corridor Network. *See* JA 368 ("The Wilmington Subdivision is part of STRACNET, the United States military's Strategic Rail Corridor Network used to ensure that the nation's rail infrastructure can be used by the military in national defense emergencies."). CSXT is subject to federal military monitoring and influence over its closure decisions that impact rail lines within this network. JA 368. To allow the City to dictate CSXT's operations directly interferes with CSXT's ability to comply with its STRACNET obligations and conflicts with the federal government's exclusive jurisdiction over interstate rail operations.

CSXT further demonstrated, again with uncontroverted evidence, that the timing of the City's request to barricade CSXT's tracks prior to Hurricane Florence

specifically constitutes an unreasonable interference with CSXT's operations. City of Lumberton corporate representative Robert Armstrong testified that prior to Hurricane Florence, the City wanted to halt CSXT's operations at the I-95 underpass *a full week before* the storm reached that area on September 14, 2018. He testified:

> Q. Had CSX said yes initially, you would have gone to work blocking, closing the VFW Road gap; right?
>
> A. Yes.
>
> Q. And does this text message and the timing of it help you pinpoint when you could have started work had CSX cooperated?
>
> A. Based on this if it was the 9th that we text Wayne, we would have been trying to start on the 7th or the 8th.

Armstrong Dep. at 137:10-19 (JA 344). CSXT also submitted undisputed sworn testimony establishing that forcing CSXT to close its tracks a full week before Hurricane Florence's September 14 landfall would have caused an enormous and extensive disruption to CSXT's customers and its busy train movements in and around Lumberton, with repercussions, such as delays caused by re-routing of trains, felt across CSXT's rail network. *See* JA 367. Such a lengthy disruption, which is the necessary outcome of the TPA *according to the contracting local government party itself*, would definitionally interfere unreasonably with CSXT's operations, and its ability to move trains through Lumberton and to serve customers along this line. JA 367.

And speaking of lengthy disruption: the TPA allows local government to regulate stoppage of track operations not only here and there, but potentially *in perpetuity*. In Appellants' own words, "The Tri-Party Agreement will be needed as long as the levee is needed." App. Br. at 23.

With CSXT's evidence presented, the burden then shifted to Appellants. And the district court then did precisely what Rule 56 requires: it assessed whether Appellants had "proffered evidence which would create a genuine issue of material fact…." JA 4877. And it found, correctly, that Appellants had not. The record of this case contains no refutation of Mr. Dilday's testimony on STRACNET and the TPA's imposition on CSXT's role in our nation's security; no evidence rebutting the burden associated with halting the movement of hazardous materials; and no evidence negating the burden inherent in disrupting national transportation whenever local government, required to consult with no one, decides a flood risk is imminent and for how long it remains so. JA 4877.

Instead, Appellants argued, as they do here, that (1) at some point in the past CSXT allowed the City to place sandbags on CSXT's tracks (App. Br. at 29-30); (2) CSXT could have withdrawn from the TPA but did not (*id*. at 30-31); and (3) CSXT's predecessor drafted the TPA (*id*. at 31). Notably, none of these assertions actually counters CSXT's evidence, for none addresses unreasonable interference, the question before the district court and now this Court.

Considering CSXT's evidence that its Wilmington Subdivision consists of approximately 120 miles of track which runs through Lumberton (JA 366), with twelve to thirteen trains moving commodities and shipments across the Wilmington Subdivision every day (JA 366); that the Wilmington Subdivision is critical to the movement of emergency supplies and hazardous materials to and from the Port of Wilmington, North Carolina (JA 367; *see also* JA 362; JA 384-385); that closure of the Wilmington Subdivision track at Lumberton would result in "considerable disruption," including delays and train traffic diversion resulting in congestion and additional delays (JA 367); and that the U.S. military can elect to influence any closure decisions that would impact the Wilmington Subdivision due to its inclusion in STRACNET (JA 368)), the district court found correctly that none of Appellants' arguments "create[d] a material issue as to whether any interference with the railroad as a result of the TPA would be reasonable." JA 4877.

In a last ditch effort to negate the TPA's obvious interference with rail operations, Appellants suggest that the consequences of track closure pursuant to the TPA would have been minimal in the case of specific hurricanes (App. Br. at 26-29) because the TPA would only be invoked in the event the City was in imminent danger of flood (*id.*), and/or because the hurricanes may have prevented train operations anyway (*id*, at 27). But these are lawyer arguments, not evidence. And evidence is what was required of Appellants to meet their burden and create a triable

issue of fact. Fed. R. Civ. P. 56(c); *Thompson*, 312 F.3d at 649 ("Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [plaintiffs'] case.") (citation omitted); *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (non-movant must point to evidence in the record that would be admissible at trial and support a judgment in its favor); *Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir. 1987) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material fact*.") (internal quotation marks and citation omitted). Nor could these notions alter the preemption calculus in any event, since ICCTA preemption does not ask whether the claim would unreasonably burden rail operations only now and then, and Appellants notably cite no authority suggesting it does.

In the end, Appellants are left to criticize the district court's ruling for its relative brevity, and for allegedly ignoring or minimizing their evidence. But Rule 56 contains no requirement for lengthy written analysis, and there was no evidence to ignore. Despite extensive discovery, Appellants proffered no evidence to create a genuine dispute on the burden component of ICCTA implied preemption. The district court, succinct or not, took full and proper account of this reality, holding: "CSX has presented evidence of both economic and logistical burdens, *which*

*plaintiffs have not meaningfully rebutted.*" JA 4878 (emphasis added). In turn, the district court rightly found that:

> Plaintiffs have not proffered evidence which would create a genuine issue of material fact as to whether the TPA unreasonably interferes with rail transportation. Although plaintiffs argue about past conduct, CSX's failure to terminate the TPA, and the fact that Seaboard drafted the TPA, none of those arguments create a material issue as to whether any interference with the railroad as a result of the TPA would be reasonable.

(JA 4877). The district court's finding of ICCTA preemption was based on overwhelming—and unrebutted—evidence, and should be affirmed.

## III.   THE DISTRICT COURT CORRECTLY HELD THAT APPELLANTS LACK STANDING TO ENFORCE THE TPA.

Appellants are not parties to the TPA, and the district court correctly found that Appellants did not meet their heavy burden to show a "genuine issue of material fact as to whether plaintiffs are third-party beneficiaries of the TPA." JA 4878.

### A.   The District Court Correctly Applied North Carolina's Law On Third-Party Beneficiary Standing.

In remanding plaintiffs' contract claim in *Edwards I*, this Court provided the parties clear guidance on the evidence required to establish third-party beneficiary standing. To bring a claim as a third-party beneficiary, a plaintiff must show three things: (1) the contract exists; (2) the contract is valid and enforceable; and (3) the contracting parties "intended primarily and directly to benefit him or the class of persons to which he belongs." *Edwards I*, 983 F.3d at 117 (internal quotation marks

omitted); *see also Holshouser v. Shaner Hotel Grp. Props. One Ltd. P'Ship*, 518 S.E.2d 17, 25 (N.C. Ct. App. 1999). The district court correctly articulated these same three elements of third-party beneficiary standing. JA 4878. The district court also correctly recognized that under North Carolina law, where the plaintiff is not a party to the contract, "the contract must be construed strictly against the party seeking enforcement." *Holshouser*, 518 S.E.2d at 25 (internal quotation marks and citation omitted). It is not enough that a third party happens to benefit from the contract, even if that benefit was foreseeable. The contracting parties must have specifically "intended to confer a legally enforceable benefit on that person." *Id.*

Appellants contend that the district court misstated and misapplied North Carolina law on third-party beneficiary standing. Specifically, Appellants cite this passage from the district court's discussion of the third standing element:

> To be a direct beneficiary, the contracting parties must have specifically "intended to confer a legally enforceable benefit on that person," as it is not enough to simply receive a foreseeable benefit. To determine whether the contracting parties intended to directly benefit a third party, courts must consider the surrounding circumstances and language of the contract. Courts require evidence of "active and direct dealings" between the plaintiff and the parties to the contract before conferring third-party beneficiary status….

App. Br. at 36 (internal citations omitted). Appellants maintain this is error: namely, that the district court imposed an "active and direct dealings" requirement that is "not consistent with this Court's opinion or North Carolina law." *Id.* In fact, the

district court did just as this Court did in *Edwards I* and as North Carolina law instructs; it looked to the presence or absence of "active and direct" dealings as *indicative* (not dispositive) of whether third-party beneficiary status exists.

Thus, in *Hospira Inc. v. Alphagary Corp.*, 671 S.E.2d 7 (N.C. Ct. App. 2009), the case relied upon by the district court and cited by this Court in *Edwards I*, the North Carolina Court of Appeals considered a manufacturer's third-party beneficiary claim against one of its vendor's sub-suppliers for breach of a supply agreement between the vendor and sub-supplier. The manufacturer, Hospira, was not mentioned in the contract, but offered evidence that it had helped to coordinate the agreement between its vendor and the sub-supplier, and that the parties understood that Hospira planned to use the vendor's finished product in manufacturing medical devices. *Id.* at 9-10. On summary judgment, the Court of Appeals found this evidence insufficient to establish third-party beneficiary status because Hospira's involvement "d[id] not involve the type of 'active and direct dealings' *which courts have required* to confer third party beneficiary status on a party not contemplated by the contract itself." *Id.* at 13 (emphasis added) (quoting *CF Indus. v. Transcon. Gas Pipe Line*, 448 F. Supp. 475, 481 (W.D.N.C. 1978) (holding that plaintiff's claim for third party beneficiary status was supported by record evidence of active and direct dealings between the plaintiff and a party to the contract).

Relying on *Hospira*, the Court of Appeals re-emphasized only last year the importance of evidence of "active and direct" dealings in third-party beneficiary standing analysis. *See Jarman v. Twiddy & Co. of Duck*. 889 S.E.2d 488, 496 (N.C. Ct. App. 2023). In *Jarman*, the Court of Appeals affirmed a trial court's determination that a forum selection clause in a rental agreement could not be enforced against the plaintiff-parents of a decedent child because the parents were not parties to the agreement and the agreement was not intended to directly benefit them. *Jarman*, 889 S.E.2d at 495-498. In so holding, the Court of Appeals noted that, like Appellants here, there was no evidence that plaintiffs ever read or were aware of the agreement's terms or were active or involved in entering into the agreement. *Id.* at 496. The Court of Appeals again concluded that there is no third-party standing where there is no record evidence of "the type of active and direct dealings which courts *have required* to confer third-party beneficiary status on a party not contemplated by the contract itself." *Id.* (quoting *Hospira*) (emphasis added).

This Court, too, noted in *Edwards I* that while it was remanding the contract claim for discovery, "[a] lack of evidence of 'active and direct dealings' might ultimately sink [Appellants'] third-party beneficiary claim." *Edwards I*, 983 F.3d at 119. As predicted, at summary judgment, Appellants' lack of evidence of "active and direct dealings"—or any other evidence that all contracting parties intended to

directly benefit these plaintiffs and confer standing upon them—did "ultimately sink" their claim. The district court found that "[p]laintiffs…failed to create a genuine issue of material fact as to whether there were active and direct dealings between the proposed third-party beneficiaries and the parties to the TPA." JA 4879. That is because there is no evidence of *any* dealings between Appellants and *any* party to the TPA, much less "active and direct" dealings contemporaneous with the signing of the agreement.[6]

Appellants perhaps chafe at the "active and direct" formulation because it helps seal their fate. As the district court recognized, "[i]t is undisputed that none of the named plaintiffs had any dealings with any party to the TPA about the agreement, including consultation, formation of the TPA, negotiation of the TPA's terms, or execution of the TPA." JA 4879. Appellants did not, indeed could not, counter at summary judgment with any evidence to raise a genuine issue of material fact as to such dealings—and they do not do so on appeal.

---

[6] Appellants rely upon *Davis & Taft Architecture, P.A. v. DDR-Shadowline, LLC*, 268 N.C. App. 327, 333 (2019) in support of their assertion that *Hospira* does not impose an "active and direct dealings" requirement to find third-party beneficiary status. Yet the *Davis & Taft* court stated that "Davis & Taft's direct dealings with the parties to the Agreement are also *of consequence*" (emphasis added) and found third-party beneficiary status because Davis & Taft's "involvement with the contracting parties evidences its status as a third-party beneficiary." In this case, it is undisputed that Appellants had no such involvement or direct dealings.

**B. The District Court Correctly Found No Evidence That All Contracting Parties Intended To Directly and Specifically Benefit Appellants.**

Regardless of whether "active and direct dealings" are required or merely revealing evidence that the contract was executed for the direct and not incidental benefit of a third party, central to the analysis is the contracting parties' intent. "[T]he third element – intent to benefit – is key here, because merely incidental beneficiaries may not maintain an action on a contract." *Edwards I*, at 117-18. Importantly, the relevant intent is that of the contracting "parties," plural. "[T]o demonstrate third-party beneficiary status, a party must show that *all of the parties* to the contract intended to directly and primarily benefit him." JA 4879 (emphasis added).

The record contains no such evidence. With fulsome discovery conducted and closed, Appellants still have no evidence that *all* of the TPA's contracting parties, including CSXT's predecessor Seaboard, intended to directly benefit them. For this reason, the district court correctly held that "plaintiffs have failed to demonstrate that there is a genuine issue of fact as to whether *Seaboard* intended plaintiffs or the class of people to which they belong to directly and primarily benefit from the TPA." JA 4880. (emphasis added).

Appellants protest that they "came forward with significant evidence of the circumstances surrounding the formation of the [TPA] which do support an intent by all parties to benefit Plaintiffs." App. Br. at 39. Yet their catalogue of supposed

intent evidence (*id.* at 39-42) centers on communications not by Seaboard but by local government actors. Their only two pieces of evidence supposedly demonstrating Seaboard's intent (*id.* at 40) show merely what municipal contracts regularly show: an intent to benefit the contracting municipality in question. Appellants point to a letter from Seaboard approving a request from the City of Lumberton and the Drainage District to construct an earthen dike "to protect the City of Lumberton [from] flooding of [the] Lumber River during a 100-year frequency only." *Id.* at 41. This shows only Seaboard's intent, through its contract with the City of Lumberton, to benefit "the City of Lumberton." Not particular individuals or neighborhoods. Not Appellants. The City. Appellants point next to testimony of a former CSXT employee again noting Seaboard's "help [to] protect *the city*…" *Id.* at 41 (emphasis added). This again simply evidences Seaboard's intent to benefit the contracting parties, who have standing and who tellingly have not raised claims of breach in connection with these events.

Appellants also lean on evidence showing that contracting parties understood that the broader Lumberton levee project would benefit residents of Lumberton. *Id.* at 39-43. But that knowledge is not enough for third-party standing under this agreement. If it were, any foreseeable incidental benefits would give rise to third-party standing. That is not the law, especially in the context of public works

agreements that by their very nature incidentally benefit the public. *See Matternes v. City of Winston-Salem*, 209 S.E.2d 481, 487-88 (N.C. 1974).

It may well be that Seaboard understood that the City of Lumberton and the Drainage District wanted to address flood and drainage related concerns. But that is a far cry from evidence that Seaboard *intended* to isolate particular communities for special protection and for privileged legal status under the TPA. On that, the evidence is nil; Appellants presented no evidence at all to indicate, much less to create a triable issue on, whether Seaboard intended "primarily and directly" to benefit anyone but its contracting counterparties. *See DeMent v. Nationwide Mut. Ins. Co.*, 544 S.E.2d 797, 801 (N.C. Ct. App. 2001). And there is certainly no evidence that Seaboard intended to vest in unidentified members of the public a perpetual legal right to sue the railroad to enforce a land use license it granted to the local government nearly half a century ago.

At most, like everyone else in Lumberton, Appellants are incidental beneficiaries of the TPA, just as public works contracts so often incidentally benefit the public. As the district court correctly found (JA 4878-4880), this does not confer third-party standing. *See Matternes*, 209 S.E.2d at 488.

## IV. THE DISTRICT COURT PROPERLY CONSTRUED THE TPA TO REQUIRE PERFORMANCE BY THE CITY AS A CONDITION PRECEDENT, WHICH INDISPUTABLY NEVER OCCURRED.

Finally, the district court properly found that even if Appellants' remaining claim was not preempted (it is) and even if Appellants had standing (they do not), CSXT is still entitled to summary judgment because their breach of contract claim fails on the merits as a matter of law because the City never built the earthen dike that Appellants claim CSXT decades later refused to allow the City to close. JA 4880-4881.

There is nothing controversial or complicated about the district court's contract interpretation. The TPA by its plain terms grants local government a license to erect and maintain a 6-foot high, 10-foot wide earthen dike on railroad property:

> That *Licensor [Seaboard Coast Line Railroad Company]*, for and in consideration of the sum of One Dollar to it in hand paid by Licensees [Robeson County Drainage District No. 1 and the City of Lumberton], the receipt of which is hereby acknowledged, and of the covenants and agreements, hereinafter made and contained on the part of Licensees to be kept and performed, *hereby grants unto Licensees the right or license to construct and maintain portions of a 6-foot, more or less, high (10-foot wide top with 3:1 side slopes)* earthen dike *on the easterly and westerly portions of Licensor's right of way at or near Lumberton, North Carolina....*

JA 76. (emphasis added).[7] Appellants' central assertion of liability is that CSXT breached its subsequent duty under section 8 of the TPA duty to allow the City to close "*said dike*" during certain storm events. Appellants concede that "[i]t is undisputed that the City has not yet completed the earthen dike." App. Br. at 45. The district court did not engage in interpretive gymnastics as Appellants would have this Court believe. It simply recognized the obvious reality that CSXT cannot be liable for failing to allow the city to close "said dike" when "said dike" indisputably *does not exist*.

According to Appellants, however, the district court invented the building of the dike and inserted it as an "unwritten condition precedent" in the TPA. *Id.* at 43. In their words, the district court supposedly erred "by construing the *right* to build a dike into a *requirement*[.]" *Id.* at 45. (emphasis in original). The district court made no such error. There is nothing "unwritten" about the dike-building purpose of this license agreement. The plainly stated purpose of the license is to permit the City and Drainage District "to construct and maintain portions of a 6-foot,

_____

[7] Under North Carolina law, a real property license is inherently limited: "'A license is not an estate and creates no substantial interest in land but merely serves to authorize one to do certain specified acts upon the lands of the licensor. A license operates merely as a permission or waiver permitting the licensee to do acts upon the land which would otherwise be a trespass.'" *Sanders v. Wilkerson*, 285 N.C. 215, 219, 204 S.E.2d 17, 19 (1974) (quoting Webster, Real Estate Law in North Carolina, § 310 (1971)); then citing Restatement of the Law of Property, Ch. 43, Licenses, §§ 512, 514-515.

more or less, high (10-foot wide top with 3:1 side slopes) earthen dike on the easterly and westerly portions of [the railroad]'s right of way[.]" JA 76. The TPA then sets out a series of covenants and agreements by the City and Drainage District, which are expressly made "in consideration" of the license to build the dike. JA 76-77. Each of the ten enumerated "covenants and agreements" expressly references "said dike," confirming that the contracting parties intended that these provisions would depend first on the licensees' execution of their right to build the earthen dike contemplated by the agreement. These "covenants and agreements" also evidence the parties' intent that the City and Drainage District would bear all responsibility and all costs or liabilities that may result from the construction, maintenance, use, presence, or failure of the dike, and that in exchange for granting the license, the railroad would bear no responsibility.[8]

Read as a whole, the TPA does one and only one thing—it authorizes the City and the Drainage District to build a 6-foot earthen dike on the railroad right of way.

---

[8] Consistent with the role of local government—not a private railroad—to address flood mitigation and protection, the enumerated covenants and agreements establish the City's and Drainage District's roles and responsibilities for constructing, maintaining, and modifying "said dike"; pledge that the City and Drainage District will indemnify the railroad and hold the railroad harmless "from and against all loss, costs, expenses… claims, suits, and judgments whatsoever in connection with… damage to property caused by or in any way connected with the construction, maintenance, failure, or presence of said dike"; and obligate the City and Drainage District to pay for any damage to the railroad right of way "which might occur as a result of the failure of said dike." JA 76-77.

Only once the earthen dike is constructed does paragraph 8 provide the City the "right and privilege of closing said dike" during flood emergencies:

> And Licensees hereby covenant and agree in consideration thereof [for the license to build the dike]:…
>
> 8(a). Said City shall also have the right and privilege of *closing said dike* across said track and the roadbed thereof ONLY in the event the City of Lumberton is in eminent danger of flood and *the closing of said dike* across Licensor's property shall be subject to Licensor's Chief Dispatcher being given at least 12 hours notice prior to such closing.
>
> (b). Said City hereby agrees that when the flooding has receded said City will *open said dike* across said track and roadbed thereof and that any expenses thereto shall be borne by said City, including, but not limited to any cost which may be incurred by Licensor in connection therewith.

JA 76-77. (emphasis added). Nothing in the TPA authorizes the sandbagging of tracks, or the stoppage of rail operations, separate from the closing of the contemplated six-foot earthen dike, which indisputably was never built.

Far from reading into the TPA "a silent condition precedent that voids the entire Agreement" (App. Br. at 45), the district court merely found that the plain language and structure of the TPA required the City of Lumberton to build the earthen dike *before* it could exercise its right and privilege to "close said dike" during flood emergencies:

> A plain reading of the TPA reveals that the construction of the dike is part of the purpose of the TPA—that is, the TPA

> granted a license to build a dike, which the City could then
> close under certain conditions. The language of the TPA
> is clear and unequivocal and must therefore be enforced as
> written.

JA 4880.

There can be no other reasonable interpretation, and Appellants offer none. "If the language of a contract is clear and only one reasonable interpretation exists, the courts must enforce the contract as written and cannot, under the guise of interpretation, rewrite the contract or impose [terms] on the parties not bargained for and found within the contract." *Crider v. Jones Island Club, Inc.*, 554 S.E.2d 863, 866 (N.C. Ct. App. 2001) (alteration in original) (internal quotation marks and citation omitted).[9] The district court correctly did just that.

## CONCLUSION

The district court's grant of summary judgment in favor of CSXT should be affirmed.

---

[9] Appellants invite the court to review the "circumstances of the case" as to why the district court is wrong in its reading of the TPA. App. Br. at 46. But the language of the TPA is clear and unequivocal, and must be enforced as written. This Court should decline Appellants' invitation to look beyond the four corners. *DeLoach v. Lorillard Tobacco Co.*, 391 F.3d 551, 558 (4th Cir. 2004) ("[U]nder [North Carolina] law, as under general principles of contract law, our task is to 'give ordinary words their ordinary meanings.'") (citation omitted).

Respectfully submitted,

<u>/s/ Scott L. Winkelman</u>
April N. Ross
Scott L. Winkelman
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone: (202) 624-2972
Fax: (202) 628-5116
swinkelman@crowell.com
aross@crowell.com

Henry L. Kitchin, Jr.
McGuireWoods LLP
300 North 3rd Street
Suite 320
Wilmington, NC 28401
Phone: (910) 254-3822
Fax: (910) 254-3823
hkitchin@mcguirewoods.com

*Counsel for Appellee*
*CSX Transportation, Inc.*

## ORAL ARGUMENT STATEMENT

Appellee respectfully submits that oral argument should be heard in this appeal due to the importance of the underlying issues in this case, as well as the multiple issues in contention between the parties. Oral argument will also allow this Court to clarify any legal or factual issues raised by the papers.

/s/ Scott L. Winkelman
Scott L. Winkelman

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation contained in Fed. R. App. P. 32(a)(7) because, excluding the portions exempted by Rule 32(f), this brief contains 10,616 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Times New Roman.

/s/ Scott L. Winkelman
Scott L. Winkelman

## CERTIFICATE OF SERVICE

I certify that on February 13, 2024, I electronically filed the foregoing brief with the Clerk of Court for the U.S. Court of Appeals for the Fourth Circuit through the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Scott L. Winkelman
Scott L. Winkelman